UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JOHN DOE,[1]<br><br>                          Plaintiff,<br>          v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>                          Defendant. | Civil Action No. |

## <u>VERIFIED COMPLAINT AND JURY DEMAND</u>

## INTRODUCTION

1.       This lawsuit arises out of defendant Dartmouth College's ("Dartmouth") unjust and unlawful expulsion of plaintiff John Doe for alleged sexual misconduct in December 2018 following an unfair, inept investigation influenced by a pervasive, campus-wide bias and based upon widely discredited set of inequitable and unfair procedures - procedures which Dartmouth failed to even follow - all to John Doe's detriment.

2.       In May 2018, John had a consensual intimate encounter with Sally Smith, another student at Dartmouth, that did not involve sexual intercourse.

3.       Shortly thereafter, Sally Smith made a complaint to Dartmouth, alleging that John engaged in nonconsensual sexual intercourse with her during their night together in May 2018. Dartmouth opened an investigation into her complaints under its sexual misconduct policy.

---

[1] Plaintiff seeks to file this complaint and all pleadings under pseudonym due to the serious and false nature of the allegations against him and the privacy implications to both himself and Sally Smith, and has concurrently filed with this complaint a motion requesting such a designation. Plaintiff will file an affidavit, under seal, providing his name, address, and attesting to the accuracy of the facts alleged in the Complaint if the Court so requests.

4.     Despite the "he said/she said" nature of the case, during the course of its investigation, Dartmouth failed to consider relevant exculpatory evidence, including the results of a polygraph test taken by John and administered by one of the most respected polygraph examiners in the Northeast and the forensic testing of clothing and bedding.

5.     Dartmouth also failed to consider the fact that Sally Smith altered text messages between her and John before submitting them to the Dartmouth investigator and lied to the Investigator and the Hanover PD.

6.     Dartmouth, acting by and through its retained investigator, also failed and/or refused to pursue obvious areas of investigation requested by John in violation of Dartmouth's own rules, and failed to conduct basic competent examinations of Sally despite objective evidence of Sally lying to police and altering evidence, among other things.

7.     Dartmouth's quasi-judicial process for hearing Sally Smith's complaint utilized the widely discredited single investigator model and lacked basic elements of due process and/or fundamental fairness, including denying John any opportunity to cross-examine witnesses offering evidence against him.

8.     On November 16, 2018, the U.S. Department of Education proposed sweeping changes to the regulations used by Dartmouth to implement Title IX which underscore the need for due process and equitable treatment for all parties, including accused parties like John, who should be entitled to a presumption of innocence, a right of confrontation and other basic protections.  Dartmouth's current disciplinary process fails to comply with the new Title IX regulations, which are soon to become law.

9.     In December 2018, Dartmouth decided that John had engaged in nonconsensual sexual misconduct with Sally Smith and provided notice of John's expulsion from the university.

10.    John has suffered and will continue to suffer serious damages as a result of Dartmouth's actions, including but not limited to the loss of his Dartmouth degree, loss of other educational opportunities, the loss of incalculable  athletic experiences, including a year or more of athletic eligibility and the benefits, including leadership training, academic and career advising, coaching, physical training, the loss of job opportunities, reputational harm, and emotional distress.

11.    Furthermore, John's request for relief from Dartmouth's improper proceeding and sanction is time sensitive.  In the event that John is not able to return to Dartmouth within the first two (2) weeks of the Winter Term that began on January 3, it is unrealistic to expect that he will be able to catch up and successfully complete the Term. Moreover, if John is not enrolled in school for the Winter Term, he will be permanently and irreparably deprived of the opportunity to play a third season of Division 1 hockey.  Accordingly, John files this Verified Complaint with Prayers for Relief seeking prompt preliminary and, finally, permanent injunctive relief barring the school's expulsion on its flawed, biased and negligently conducted disciplinary process.

## JURISDICTION AND VENUE

12.    This action arises out of Dartmouth's breach of its contractual and other obligations to John Doe, as well as its violations of Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681).

13.    John is an out-of-state resident, and Dartmouth is a resident of New Hampshire. The amount in controversy is over $75,000.

14.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1332.

15.    Venue is proper in this district under 28 U.S.C. § 1391(b).

**PARTIES**

16.     John Doe is a U.S. citizen who resides outside of New Hampshire. At all times relevant to this complaint he was a student at Dartmouth College.

17.     Defendant Trustees of Dartmouth College is a partially federally-funded private liberal arts college in Hanover, New Hampshire.

**FACTS**

**John Doe's Academic and Athletic Background and Goals**

18.     John grew up and currently lives in Massachusetts. John went to high school in Massachusetts and graduated *cum laude*.

19.     Prior to Dartmouth's decision to expel him, John was a junior at Dartmouth on track to graduate in the Spring of 2020.

20.     John is enrolled at Dartmouth in the Economics program. As of the completion of the Fall 2018 term, he has a 3.52 GPA.

21.     While a student at Dartmouth, John has participated in peer tutoring, providing 1-on-1 guidance to undergraduate students in calculus. In order to qualify as a peer tutor in calculus, John was required to earn at least an A- in the subject.

22.     Until Dartmouth's decision to expel him, John played on Dartmouth's hockey team as both a forward and on defense. Hockey has been a huge part of John's life since he was a child. John was the captain and leading scorer on the hockey team at his high school. In accordance with his commitment agreement with Dartmouth, John took a year off between graduating high school and starting at Dartmouth to play junior hockey. John's success as a hockey player was a contributing factor to his admission at Dartmouth.

23.     John's life at Dartmouth as a student athlete is very busy, both in and out of hockey season.  Before the hockey season starts on October 1, the hockey team practices and works out all summer and through the beginning of the fall.  Once the season starts in October, the hockey team alternates playing home and away games every other weekend.  For away games the team generally leaves campus on Thursday.

24.     As part of his athletic career at Dartmouth, John has participated in the D.R.I.V.E. leadership program open to student athletes at Dartmouth.  D.R.I.V.E. brings together student athletes from across all of the sports at Dartmouth to discuss leadership and to learn more about being a good leader and teammate.  The program emphasizes development, resilience, ingenuity, valor, and excellence.

25.     As a student athlete at Dartmouth, John has access to free tutoring through the Tutor Clearinghouse and academic advisors.

26.     As part of Dartmouth Peak Performance, which is available only to student-athletes, John has a variety of opportunities available to him, including but not limited to a nutritionist, sports psychologist, career advising, and leadership coaching.  John also has an alumni mentor that helps with balancing the competing stresses of being a student and an athlete, and also with career placement after graduation.

27.     Being a student athlete also has other intangible benefits that are of the utmost value to John, including the spirit of competition in chasing a championship title, the camaraderie with his teammates, and the privilege of representing his school on a public stage.

28.     Following the completion of his undergraduate degree, John intends to pursue a career in professional hockey and a career in finance on Wall Street.

29.     John has been accepted to an internship for the summer of 2019.  Prorated, his salary in this position is the equivalent of $85,000 per year with the opportunity to earn a signing bonus of $5,000.  Upon successful completion of this internship, the employer would offer John a full-time position after graduation.  If John is expelled from Dartmouth, he loses this internship and career opportunity.

30.     Dartmouth has been paid $23,389.88 for John Doe to enroll in the Winter 2019 Term that begins January 3, 2019, and John is fully enrolled in classes.

### Plaintiff's Interactions with Sally Smith

31.      John Doe had been friends with Sally since they both started at Dartmouth in the Fall of 2016.

32.     John and Sally were friends during their freshman and sophomore years, and John was often a welcoming ear and a shoulder for Sally to cry on in times when she was dealing with personal issues.

33.     Previous to the early morning hours of Sunday, May 20, 2018, John and Sally had engaged in consensual sexual activity on one occasion that did not include sexual intercourse and on one occasion that did include consensual sexual intercourse, but were not in a dating relationship.

34.     John was off from classes during the Spring 2018 term[2] and was working at an internship in Boston.

---

[2] Dartmouth utilized a unique term scheduling system for its undergraduate programs called the "D-Plan."  Under the D-Plan, "Dartmouth offers four 10-week terms per year," Fall, Winter, Spring and Summer.  "A Flexible Study Plan," Dartmouth.edu, https://home.dartmouth.edu/education/undergraduate-experience/flexible-study-plan. "[W]ithin some guidelines, you choose which 12 terms to enroll" to constitute their undergraduate programs. Id. In their first year, students are required to enroll in the Fall, Winter, and Spring terms, and may choose to enroll in the Summer term.  In their Sophomore year, students are required to enroll in the Summer term ("Sophomore Summer"), and may enroll in as many or as few of the other three terms as they wish.  In their Junior year, students have full freedom for all four terms.  Finally, students' Senior year is identical to their first year.

35. During the Spring term, Dartmouth hosts Green Key Weekend ("Green Key"), which includes various events scheduled throughout a long weekend.

36. On Tuesday, May 15, 2018, John and Sally exchanged text messages in which they discussed the upcoming Green Key and John anticipated needing a place to stay one or more nights while he was on campus. Attached hereto as Exhibit A is a chart containing the true and accurate content of the text messages exchanged between John and Sally from May 15, 2018 through May 20, 2018. As is made clear in Exhibit A,[3] Sally initiated the texting conversation on May 15.

37. In response, Sally said "of course . . . me casa es sue [sic] casa . . . of course, you are totally welcome to stay . . . i have a pretty damn comfy bed--just saying . . . if I have a guy you can stay in my room and ill go to their room," to which John responded "Sounds good." See Exhibit A at TM35-TM42.

38. John took Friday, May 18, 2018 off of work and came up to Dartmouth with a friend on Thursday evening. At 10:54 p.m. on Thursday, May 17, John texted Sally: "Looking like I'm going to need that sleepover haha," Sally replied: "Lmao I'm just going out rn [right now]." Exhibit A at TM48-TM49. At 12:39 a.m. on Friday, May 18, John texted: "Just let me know what your plan is." Id. at TM51. Sally replied: "Still drunk and dancing lmao . . . i think I'm gonna be hanging out with someone tonight--tbd i might kick them out." Id. at TM53, TM55. John ended up sleeping on the floor of a one-room single that night.

39. On Friday, May 18, after exchanging texts with Sally that day, John texted: "I really need a place to sleep if a guy isn't sleeping over. . . . Plus I wanna say hi at some point

---

[3] Certain text messages in Exhibit A have been redacted because they include personally-identifiable information, such as other student names, the names of fraternities and sororities, the names of dormitories, and the name of John's internship placement. Allegations quoting these text messages will be similarly redacted. John Doe will file an unredacted version under seal if the Court requests.

haha." Id. at TM69-TM70.  Sally responded: "Yes yes of course I wanna say hi too!!!!"  Id. at

TM71.  Later that night, John texted: "We should meet up soon.  If you wanna go out after you

should but I'm so tired and need a bed . . . Because I slept on a floor last night."  Id. at TM85-

TM86.  At 1:50 a.m. on Saturday, May 19, after John had already gone to bed, Sally responded:

"...Wya [where you at]?"  Id. at TM89.  John ended up sleeping in a double suite that night with

five other people.

40.     At 11:19 a.m. on Saturday May 19, Sally texted John: "[JOHN] . . . U GO TO

SLEEP SO EARLY."  Id. at TM90-TM91.  John responded: "Hahahaha . . . It was a long day . . .

Hahah ya I needed a bed bad."  Id. at TM91-TM92, TM96.  At 2:17 p.m., Sally texted: "AGH IF

U WERE AWAKE LATER !! also i just wanna say hi."  Id. at TM97.

41.     At 8:56 p.m. on Saturday, May 19, John texted Sally: "Maybe say hi at some

point?"  Id. at TM100.  Sally responded affirmatively but that she was studying for a midterm.

Id. at TM101.  John texted: "Ok text me when you're done studying we can watch a movie or

something."  Id. at TM102.

42.     At 12:08 a.m. on Sunday May 20, John texted Sally: "I leave tomorrow so we

have to say what's up."  Id. at TM104.  Sally responded that she was still studying and she had to

go to bed soon but that she wanted to "say hi too".  Id. at TM105, TM110.  John texted: "Ok

should I head over now?"  Id. at TM111.  Sally responded: "Yeah but don't expect to come to

my room and hook up."  Id. at TM112.  John responded "Sounds good."  Id. at TM113.

43.     John went to Sally's room.  They put on a movie and got onto Sally's bed.

Eventually, they began snuggling while watching the movie before kissing consensually and

progressed to other limited consensual sexual activity, including John's kissing and caressing of

Sally's body, including her breasts and genital area, outside of her clothing.  John removed his

clothes, but they did not engage in sexual intercourse, and Sally's clothes remained on for the entirety of the evening.

44.     At some point later, Sally left her room, explaining to John that she needed to go help a friend.  John suspected nothing out of the ordinary, since it is not uncommon for people to drink too much during Green Key and need help.

45.     John awoke in the morning, collected his belongings, and left Sally's room.  At 9:44 a.m. on May 20, Sally texted John saying, "Had to deal with a friend last night. Don't know when I'll be back--been a shit show."  An hour later, John responded: "100 % understand."

46.     John completed the remainder of his finance internship in Boston and returned to campus for the Summer term.

## Sally Smith's Complaint to Dartmouth

47.     On Sunday, May 20, 2018 at 1:05 p.m., Sally Smith emailed Dartmouth's Title IX office stating that "there was an incident last night."

48.     On May 21, 2018, Sally Smith met with Dartmouth's Title IX coordinator, Kristi Clemens, to discuss the incident and made an official report.  Ms. Clemens made a record of Sally's report that same day.

49.     Upon information and belief, the incident was reported to the Hanover PD shortly thereafter, and the Hanover PD commenced its own investigation.

50.     Following the report to the police, Dartmouth was asked to suspend its investigation while the Hanover PD conducted its investigation.

51.     Although Sally scheduled an appointment with Dartmouth's College Health Services for Thursday, May 24, 2018 to obtain a Sexual Assault Nurse Examiner (SANE) exam, she failed to show up for her appointment and undergo the SANE exam.

52.     On July 2, 2018, John met with a Hanover PD officer to discuss Green Key.  John was not apprised of any allegations against him at that time.

53.     In the beginning of July 2018, the Hanover PD gave Dartmouth permission to proceed with its Title IX investigation.

54.     As of the date of filing, no criminal charges have been brought against John resulting from the complaint made to the Hanover PD.

**<u>Dartmouth's Unified Disciplinary Process</u>**

55.     Dartmouth investigates and administers discipline for allegations of sexual assault in accordance with its Unified Disciplinary Procedures for Sexual Assault ("Unified Disciplinary Procedures").  "Unified Disciplinary Procedures for Sexual Assault," Dartmouth Office of Judicial Affairs, effective June 18, 2014, available at https://student-affairs.dartmouth.edu/policy/unified-disciplinary-procedures-sexual-assault.

56.      The scope and timing of the investigation depends upon "whether ongoing fact gathering by the police requires a temporary delay in further factual investigation by the College."  <u>Id.</u> at V.A.

57.      Under the Dartmouth Unified Disciplinary Procedures, "Upon initiating the investigation, the Director of Judicial Affairs will send the Reporting Person and the Responding Person a notice of investigation which will include: a copy of the charge; the name and contact information of the Investigator; and a copy of this policy. The Director of Judicial Affairs will also inform both parties of Dartmouth's policy which prohibits Retaliation."  Unified Discipline Procedures at V.B.1.f.

58.     Once an investigation is initiated, the Unified Disciplinary Procedures guarantee that under the policy, the "investigation will be conducted in a prompt, <u>fair</u>, <u>thorough</u>, and

impartial manner." Unified Discipline Procedures at V.B.1.g (emphasis added). The Unified Discipline Procedures further promises that an investigation "will include, at a minimum, speaking separately with the Reporting Person, the Responding Person and pertinent witnesses, and soliciting and reviewing documentation relevant to the investigation including available police reports." Id. (emphasis added). However, under the Unified Disciplinary Procedures, the "Reporting and Responding Persons will not be permitted to directly question each other and will not be required to be present together at any point." Id. (emphasis added). The Unified Disciplinary Procedures do not provide for a live hearing. Id.

59.     Additionally, the Unified Disciplinary Procedures requires that "[a]ll parties and witnesses are obligated to be completely honest during the course of the investigation. Any person who knowingly makes a false statement in connection with the investigation may be subject to College disciplinary action. False statements include statements that omit a material fact, as well as statements that the speaker knows to be untrue." Unified Discipline Procedures at V.B.1.h.(emphasis added).

60.     The Unified Disciplinary Procedures also encourage reporting persons and responding persons to "preserve all information and tangible material relating to the incident," including "electronic communications (e.g., e-mails and text messages), photographs, clothing, bedding, and medical information." Id. at IV.D. "In the case of medical information, prompt examinations can be crucial." Id.

61.     With respect to concurrently pending law enforcement proceedings:

> The College will . . . comply with valid requests by law enforcement for cooperation in a criminal investigation and may need to delay temporarily an investigation under this policy while law enforcement is in the process of gathering evidence. Once law enforcement has completed its gathering of evidence, the College will resume and complete its investigation. If the Reporting Person wishes to pursue disciplinary charges under this policy while

criminal proceedings are pending, or if the College determines that disciplinary proceedings should proceed, the College will not wait for the conclusion of the criminal case to proceed with the disciplinary process. If the College finds that Sexual Assault occurred, it will take effective steps to end it, prevent its recurrence, and address its effects, regardless of whether external legal proceedings are pending.

Id. at VI.D.

62.     Following a finding of misconduct by the Investigator, the Reporting and Responding Persons are permitted to "submit a statement of position to the Sanctioning Panel by providing a copy to the Director of Judicial Affairs within five (5) calendar days after the Director has notified them of the Investigator's determination of responsibility." Id. at V.B.4.

63.     Under the Unified Disciplinary Procedures, an appeal opportunity is available, but "[a] party may only request review on the following grounds: [1] That the Investigator or the Sanctioning Panel committed procedural error which materially prejudiced the party requesting review's case; [2] That the Investigator's findings or the Sanctioning Panel's decision should be reconsidered because of newly discovered information which was not reasonably available to the party requesting review during the investigation and which would likely have affected either the finding of responsibility or the sanction imposed had it been available; or [3] That the sanction imposed is excessive, insufficient, or inappropriate." Id. at V.B.6.a.  In considering an appeal, Dartmouth appoints a "Reviewing Official" who consults with the Dean of the school of both the reporting and responding person in rendering a decision.  Id. at V.B.6.b, c.

64.     Under the Unified Disciplinary Procedures, the "College reserves the right, pending the review, to direct that a Student found responsible for violation of this policy, and for whom the sanction of suspension or separation has been imposed, be required to leave campus during the time the review is pending. This decision will be made by the Dean of the College (in

the case of undergraduate Students) or the Dean of the involved graduate or professional school (in the case of graduate or professional school Students)." Id. at V.B.6.d.

65.     The Unified Disciplinary Procedures states that they "will apply to all complaints of conduct regulated by this policy made by students, faculty, staff, or third parties, and **will take precedence over any other Dartmouth policies and procedures** with respect to such complaints." Id. at I (emphasis added).

## **Dartmouth's Procedurally Deficient Investigation**

66.     On July 5, 2018, Director of Judicial Affairs Katherine Strong provided a letter to John Doe notifying him of Dartmouth's investigation and stating:

> It has been determined that the report of sexual misconduct made to Title IX Coordinator Kristi Clemens should be referred for further investigation. Specifically, it is alleged that on or about May 19, 2018 you engaged in sexual intercourse with [Sally Smith] '20 without her consent. This behavior would be in violation of Dartmouth's Community Standards of Conduct III.

67.     The letter also notified John that attorney Sara Hellstedt had been named as the investigator for the matter ("Investigator"). The letter did not provide any detail about the specific allegation of nonconsensual sexual intercourse. Included with the letter was a Statement of Understanding to be signed by John.

68.     On July 12, 2018, Dartmouth's Title IX Coordinator, Kristi Clemens, issued a No Contact Order, prohibiting John from having any contact with Sally.[4] John diligently followed the No Contact Order.

69.     On July 13, 2018, John submitted his signed Statement of Understanding, which denied the allegation of nonconsensual sexual intercourse. On July 20, 2018, John submitted to

---

[4] The No Contact Order, by its terms, actually prohibited John from having any contact with himself, which John believes to have been the result of a typographical error.

the Investigator a statement of cooperation, proposed witness list, complete text message exchange with Sally, and summary of evidence.

70.     On July 18, 2018, Sally met with the Investigator and provided a selected excerpt of the text messages between her and John.  See Exhibit A.

71.     On August 1, 2018, John met with the Investigator for an interview.  On August 17, 2018, John again met with the Investigator for a follow-up interview.  John and his advisor asked the Investigator if they could record the interviews.  After speaking with the Director of Judicial Affairs, Katherine Strong, the Investigator denied them permission to record the interviews.

72.     On August 22, 2018, John submitted a letter to the Investigator, which states his position regarding Sally's allegations, requests certain discovery from Dartmouth, and clarifies certain of his responses to questions asked during the August 17 interview.  He also requested additional information about the allegations against him so that he could "defend [him]self knowingly against the[] accusation(s)" and "participate meaningfully in [the] investigation."

73.     On August 30, 2018, the Director of Judicial Affairs, Katherine Strong, emailed John and confirmed Dartmouth's position that it had provided adequate notice of the allegations against him:

> You were given notification of the allegation under investigation in the notification packet provided to you at your meeting with Adam Knowlton-Young and Kristi Clemens on July 5, 2018. You were also given the opportunity to respond to that allegation in your Statement of Understanding which you returned to our office, denying the allegation.

**The Investigator Failed to Properly Consider That Sally Submitted Falsified Evidence**

74.     In her initial interview with the Investigator, Sally Smith agreed to provide all of her text messages with John Doe to the Investigator.

75.     In her submission to the Investigator, Sally included text messages between her and John from Saturday, May 19, 2018.  However, the text messages she submitted were not complete.  Rather, the messages Sally submitted were edited to remove or change certain statements to inculpate John.

76.     Sally did not submit a complete set of the text messages between her and John from the weekend in question.  The messages Sally provided begin with a message from John from 1:12 p.m. on Saturday, May 20, stating "Haha ya I needed a bed bad."  See Exhibit A at TM96.  She did not provide any messages before that one, despite that they had exchanged 95 text messages between Tuesday May 15 and that message on May 20, most of which were about Green Key and some of which conveyed John's anticipated need to find a place to stay that weekend and Sally's invitation for him to stay with her, telling him "mi casa es sue casa".  See id. at TM1-TM95; TM36.

77.     The complete text messages that John provided show that John's message that he "needed a bed bad" was in response to a text message Sally sent to John on the day in question – May 19 – that she had wanted to see John the night before but he went to bed too early.  See id. at TM90-TM91 ("Sally: [JOHN] . . . U GO TO SLEEP SO EARLY").  Other texts from that weekend show that Sally was eager to see John.  See, e.g., id. at TM84 (Sally: "Yeah! I wanna see ya too!").

78.     Sally's submission of a select excerpt from their text messages from that weekend leaves out the full context, including that Sally was eager to see John, that she was frustrated that John went to bed early the night before, and that Sally was receptive to John's  messages at multiple points before and during the weekend that he may be looking for a place to stay during the weekend.

79.     Sally's submission of text messages also omitted her next message that followed John's message that he "needed a bed bad."  At 2:17 p.m. she again texted John: "AGH IF U WERE AWAKE LATER!! Also i just wanna say hi." Id. at TM97.  John didn't respond to that text until 8:56 p.m. when he told her where he was going and asked whether she was going out. Id. at TM98-TM100.

80.     Before submitting her texts to the Investigator, Sally deleted or otherwise omitted her 2:17 p.m. text to instead make the text chain look like John told her at 1:12 p.m. "Haha ya I needed a bed bad," and then the next text between them was from John at 8:56 p.m. telling her that he was going out.  Id. at TM96-TM98.  This omission results in a text exchange that is misleading and that inaccurately diminishes Sally's eagerness to see John that weekend.

81.     On November 28, 2018, John brought the issue of Sally's doctored text messages to the Investigator's attention.  On November 29, the Investigator stated in response: "I have received the complete set of text messages between you and [Sally] that you provided early in the investigation, and compared them to the subset of text messages [Sally] provided when I met with her.  As a result, no further investigation into the matter is necessary."

82.     Sally was not disciplined for providing falsified evidence to the Investigator, nor did the Investigator appear to discredit any statements or accounts given by Sally in light of her presenting false evidence.

83.     Considering that Sally submitted doctored text messages to the Investigator, John is not aware of any efforts by Dartmouth to ascertain whether other evidence she submitted was not similarly manipulated.

**Dartmouth Refuses to Allow the Investigator to Consider the Results of John's Polygraph Examination**

84.     Shortly after receiving notice of the allegations against him, John arranged to take a polygraph examination.

85.     On July 25, 2018, John took a polygraph examination conducted by John Consigli of Consigli Polygraph Services.  The examination consisted of two series, each of which included two questions which were carefully crafted to match the charges levied against John in Dartmouth's investigation:

> Series 1:
> Did you engage in sexual intercourse with that woman?
> Did you engage in sexual intercourse with that woman that night in her room?
>
> Series 2:
> Did you have sexual intercourse with that woman that night?
> Did you have sexual intercourse with that woman that night in her room?

86.     John answered "No" to all four questions.  The examiner's analysis of the results of the testing determined that they did not indicate any deception in John's responses.  The results were then sent to Milton O. Webb of Dunn, North Carolina for a blind score peer review.  Mr. Webb scored the results of the first series as inconclusive and the results of the second series as not indicating any deception.  Based on his own analysis and the peer review, Mr. Consigli gave his final opinion on July 26, 2018 that there was no deception indicated in John's answers to the four questions.

87.     The polygraph examination was a single-issue polygraph, which "provides a greater overall accuracy than [a] multi-issue exam[]." Nelson, Raymond, "Scientific Basis for Polygraph Testing," 44(1) Polygraph 28, 43 (2015),

https://apoa.memberclicks.net/assets/docs/nelson_2015_scientific_basis_for_polygraph.pdf.

88.     In short, the polygraph examination determined - based on a 95% confidence interval - that John was telling the truth that he did not have sexual intercourse with Sally on the

night in question.  The polygraph also served to support John's credibility, which Sally publicly

challenged, when he testified truthfully and to the same effect before the Investigator.

89.     John provided the polygraph results to the Investigator at his first interview on

August 1, 2018, which she accepted.  During the August 17, 2018 follow-up interview, the

Investigator stated her assumption that the evidence could be considered because the Unified

Disciplinary Procedures is silent on the consideration of polygraph evidence.  However, she

recommended that John and his counsel follow up on the issue with Dartmouth's General

Counsel about whether the Investigator could consider the polygraph results and, if so, how

much weight the results should be given.

90.     The Investigator's deference to the Dartmouth General Counsel on this issue

negates any notion that the Investigator was independent of Dartmouth.

91.     On August 20, 2018, John's counsel sent an email to Dartmouth's General

Counsel, Sandhya Iyer, requesting that Dartmouth's investigation include consideration of the

polygraph results.

92.     On September 4, 2018, Dartmouth Associate General Counsel Dana Scaduto sent

a letter to John's counsel stating that "Dartmouth does not allow polygraph examinations to be

considered in any student proceedings, including those conducted under the College's Title IX

process."

93.     John also offered to make Mr. Consigli and Mr. Webb available for interview by

the Investigator, but Dartmouth refused to permit such interviews to occur.

94.     The Unified Disciplinary Procedures do not include any discussion of polygraph

results, including any prohibition on their consideration in Dartmouth's Title IX investigations.

95.     There is no publicly-available Dartmouth policy prohibiting the consideration of polygraph results in student disciplinary proceedings.

96.     Dartmouth's Uniform Disciplinary Procedures state that they "will take precedence over any other Dartmouth policies and procedures with respect to such complaints," yet the unwritten "no polygraph" rule, which was not delivered to John with the notice of charge, is mentioned nowhere.

**Dartmouth Refuses to Delay Investigation Pending Results of Hanover PD Forensic Testing**

97.     On information and belief, in or about June 2018, Sally submitted the clothing she claims she was wearing on the night/morning of the incident to the Hanover PD.

98.     During her interview on July 18, 2018, Sally told the Investigator that her "underwear and clothes never got washed," that "the police came and got them," and that they "are at the lab right now."  She indicated her understanding that the police were conducting forensic testing of her underwear and clothing.

99.     On October 8, 2018, after seeing the transcript of Sally's July 18 interview for the first time, John notified Dartmouth that Sally had submitted her clothing to Hanover PD for forensic testing and requested that Dartmouth pause its investigation until the Hanover PD had received the results of its testing.  Dartmouth initially approved John's request and paused the investigation on October 12, 2018, stating, in an email: "We are currently working to see how soon this information will be available. It may not be until mid-December."

100.     On November 12, 2018, Judicial Affairs Director Strong notified John that the Office of Judicial Affairs "[had] been notified that the Hanover Police Department will not share any results from forensic lab testing with the College, regardless of when they become available," and that Dartmouth's investigation would resume.

101.    On November 16, John emailed Director Strong, requesting additional information about the change in Hanover PD's position.  On November 20, Director Strong responded, stating the following:

> Over the last few weeks, we spent a good deal of time communicating with both HPD and the County Attorney about the importance of the availability of all potentially material and relevant information to Dartmouth's Title IX process. After considering our position, we were informed that the initial position of HPD that the test results would not be released to Dartmouth at any time was final. Our process is moving forward to completion utilizing all information available to us at this time. Should the test results we have been seeking from HPD or the County Attorney become available at some point in the future, we invite you to bring it to our attention.

102.    Upon information and belief, the Hanover PD has never indicated that it would never release the results of the forensic testing to John and Sally.

103.    In her final report, the Investigator noted that "[w]hile [the] investigation would have considered the result of the forensic testing had the Hanover [PD] agreed to provide it, the result would have been one point of data among a constellation of many, and would not necessarily have been dispositive or entitled to greater or lesser weight than any other."

104.    Dartmouth never requested that either John or Sally cooperate in asking the Hanover PD to release the results of the forensic testing to Dartmouth or to request that Sally's clothing - or any biological material extracted therefrom - be released so that Dartmouth, John or Sally could seek independent testing.

105.    John was never given an opportunity to seek independent testing of Sally's clothing or any biological material extracted therefrom.

106.    As of the filing of this Verified Complaint, John has not received any notice from the Hanover PD that it has received the results of the forensic testing or that it has concluded its investigation.

**The Investigator Failed to Conduct Any Follow-up Investigation of the Inconsistencies in Sally's Account**

107.    John was not permitted to cross-examine Sally or to question her in any way in real-time or through written interrogatories at any point during the investigation.

108.    On September 21, 2018, the Investigator issued a 14-page preliminary report, with 612-page appendix ("Preliminary Report"), in which she made findings that John engaged in non-consensual sexual intercourse with Sally.

109.    This Preliminary Report was the first time that John was really informed of what the details of the allegations against him were.  Therefore, John had not had the opportunity to respond to those details in his prior statements and submissions to the Investigator.

110.    On October 8, 2018, John submitted a 10-page response to the Preliminary Report in which he raised concerns about certain inconsistencies in Sally's story, factual inaccuracies in the Preliminary Report, and relevant evidence not considered by the Investigator.  John's response identified the following inconsistencies in Sally's story:

   A.  Sally's inconsistent statements on whether she and John had had intercourse in the Fall of 2017;

   B.  Sally's false statement to the Hanover PD that John texted her the morning after the incident and caused her distress, when in fact she was the one who texted first;

   C.  The inconsistency between Sally claiming she was trying to draw a clear line that she and John would not be engaging sexually that night and her statement that she undressed in front of him;

   D.  Sally's statements that she avoided John's teammates which was contradicted by the evidence that she sought out nearly half of John's teammates who were on campus that summer to share her account of what happened between her and John;

   E.  Sally's false statements about being approached in the dining hall by the girlfriend of one of John's teammates;

   F.  The inconsistencies between the photographs of the bruise on Sally's leg that she submitted to the Investigator and the story she told about how she got that bruise;

G. The inconsistencies between Sally's various accounts of her involvement in the incident (e.g., "just laying there" vs. engaging in a "struggle" against John);

H. The three contradictory stories Sally gave about what she did with the clothes she was wearing that night between the time she took them off to shower and when she provided them to the police (i.e., telling the Hanover PD officer that her clothes were in the back of her drawer, telling the Investigator that she put her clothes in a plastic bag immediately after showering on May 29, and the text messages from May 22 confirming that she had not done anything with her clothes before that point);

I. The inconsistency between Sally stating that she tried to avoid John's teammates and his fraternity and that fact that in July, when she knew John was living at the fraternity house, she asked if she could attend a party at the fraternity house; and

J. The inconsistency between Sally stating that John was partying on campus and at his fraternity during the Summer and Fall terms, when John provided evidence that he went home to be with his family every available weekend during the investigation.

111.   Additionally, John provided several proposed questions for the Investigator to ask Sally.

112.   John also identified a new proposed witness for the Investigator to interview and suggested further questioning of one existing witness and of Sally.  These suggested lines of inquiry could have potentially shed light on possible motivations for Sally to embellish or provide a false account of what occurred on May 20, and to impeach Sally's credibility on certain facts.

113.   Upon information and belief, the Investigator did not conduct any interviews of the individuals identified by John in his October 8 response, conduct any follow-up investigation on the inconsistencies John identified, ask any of the questions John requested, or ask any obvious questions like, "why did you omit the 2:17 p.m. text message from your submission," or "why did you omit the text messages where you told John 'mi casa es su casa' or that you have a 'comfy bed'"

114.     On November 29, 2018 , the Investigator issued her 19-page final report, with 613-page appendix ("Final Report"), in which she concluded that "the preponderance of the evidence supports a finding that [John] engaged in penetrative sexual intercourse without [Sally's] consent" and that "[a]s a result . . . [John] committed sexual assault against [Sally] in violation of Standard III of the Unified Procedures."

115.     In this Report, the Investigator attempted to explain away Sally's omissions and falsifications by stating, "Because [John] provided a complete set of text messages early on in the investigation, [Sally] was not asked to supply a duplicative set."

116.     The Final Report did not indicate that the Investigator credited John's evidence or witnesses, conducted any of the additional investigation John requested, asked any of the questions submitted by John of Sally or other witnesses, or discredited Sally's text messages or other statements based on her objectively demonstrable omissions and misrepresentations in her text message submission.

117.     Furthermore, in her Final Report the Investigator credits the account of a friend of Sally's - who is the girlfriend of one of John's friends - in part because of the Investigator's incorrect finding that the girl is **John's** friend.  Additionally, appended to the Final Report are text messages between Sally and this friend where the friend says of hockey players: "They're all trash . . . I hate them all."  This girl's friendship with Sally and her obvious bias against hockey players casts doubt on her credibility, but this was ignored by the Investigator.

118.     The Preliminary Report and Final Report - along with other documents comprising the substantial majority of the relevant record in this case - are available to John through a secure online portal ("Portal").

119.    The Portal is only accessible by users authorized by Dartmouth, including John and his counsel.  None of the documents available for review on the Portal are available to download or print.  Accordingly, John does not yet have in his possession a copy of the Preliminary Report, Final Report, or other relevant documents.

120.    Undersigned counsel has conferred with counsel for Dartmouth and are working cooperatively to obtain the documents pursuant to an appropriate protective order.  In the event that the documents are obtained, John will file them under seal pursuant to the anticipated protective order.  If no agreement on the protective order can be reached and Dartmouth refuses to make the relevant materials on the Portal available to John, his counsel, and the Court for the purposes of litigating and resolving this matter, John intends to request that such refusal result in an adverse inference against Dartmouth.

## The Sanctioning Process

121.    Pursuant to the Unified Disciplinary Procedures, the proceeding next went to a sanctioning panel ("Sanctioning Panel") for determination of John's sanction based on the Investigator's findings.  The Sanctioning Panel consisted of: Adam Knowlton-Young, Assistant Director of Judicial Affairs; Dean Katherine Burke, Student Affairs; and Professor Nathaniel Dominy, Anthropology.

122.    On December 4, 2018, John Doe submitted an initial sanctioning statement to Dartmouth's Office of Judicial Affairs to be forwarded to the sanctioning panel that would determine John's sanction(s).  John's statement expressed his sorrow over the situation, provided some context for his feelings and understanding during the incident, and included some background about his positive experiences at Dartmouth.

123.     In her statement on sanctioning, Sally Smith was again dishonest by omitting and misrepresenting material facts, including misquoting John's statements from written text messages.

124.     In her statement on sanctioning, Smith claimed to quote from text messages John sent her. She wrote, "1:12PM—[John]: "I need a bed bad." She then editorialized "*Where did you stay last night? Don't you already have a place to stay? Why do you NEED to stay with me?*"

125.     This is a misrepresentation of both the actual text of the message, and the meaning of the message in the context it was sent. As explained above, the text John sent her at 1:12 p.m. on May 19, 2018 was in response to a text she had sent him a few hours earlier complaining that he had gone to bed too early the night before when she had wanted to see him. John responded, referring to how tired he had been since he had been sleeping on friends' floors and in crowded dorm rooms that weekend: "Hahah ya I need*ed* a bed bad."  (Emphasis added). The statement was in the past tense, as it was about why John had gone to bed early the night before. And, as explained in depth above, her response was to say "IF U WERE AWAKE LATER," indicating she would have wanted to see John the night before, and then saying "i just wanna say hi."

126.     John was not, as Sally made it seem in her sanction statement, saying he needed a bed for the night of the 19th.  Rather, he was apologizing for going to sleep the night before when she had repeatedly made clear both on the night of the 18th and morning of the 19th she had wanted to see John the night of the 18th.

127.     Sally's statement also presented two texts as being closer in the conversation than they actually were, thereby altering the tone of the conversation.  Her statement included the

following two texts: "1:41 AM--[Sally]: 'Don't expect to come to my room and hook up' . . . 1:43 AM--[John]: 'can you let me in.'"  See Exhibit A at TM112, TM118.  Her presentation of these texts purposefully omitted five text messages, three of which were Sally communicating her eagerness to see John:

> JD: Sounds good
>
> SS: Perf
>
> SS: Yes then
>
> SS: Come to [REDACTED DORMITORY]
>
> JD: Walking

Id. at TM113-TM117.  These omitted text messages show John's understanding of Sally's boundary that he should not expect to "hook up" and Sally's excitement at him coming to see her.  Sally's omission of this crucial context in her sanctioning statement results in a misleading exchange.

128.    Sally's statement was also highly critical of the delay in Dartmouth's proceeding to allow for Hanover PD to test the clothing that she had provided to them, and lamented how long the proceeding had taken.

129.    On December 10, 2018, at 7:26 a.m., after being given a second opportunity to submit a sanctioning statement, John emailed a supplemental sanctioning statement to the Assistant Director of Judicial Affairs for forwarding to the Sanctioning Panel.  In addition to the items included in his previous statement, the supplemental statement also included a plea for the Sanctioning Panel to "look at the evidence in the record, rather than [Sally's] characterization of that evidence."

130.    The Sanctioning Panel determined that the sanction for the finding that John had engaged in sexual assault was to be his expulsion from Dartmouth.

131.    At the meeting with Katherine Strong at which she notified John of the expulsion decision, John indicated that he would be appealing the decision and asked about requesting to remain on campus pending the appeal.  Ms. Strong indicated that he could make a request, but that the decision had already been made that his request to remain on campus would be denied.

132.    On December 13, 2018, John made a formal request to Dean Kathryn J. Lively, Dean of Students, to remain on campus while he appealed the Investigator's findings and the sanctions against him.

133.    Even though John had been permitted to remain on campus in classes and participating in all athletic activities during the pendency of the investigation, most students were off campus for winter break, and he had paid tuition for the upcoming Winter Term, his request was denied.

134.    Over the course of the investigation, John remained on campus, was never a threat to anyone, and strictly adhered to the No Contact Order.  There was not reason to believe he was a danger to the community, especially because at the time of expulsion almost no one was even on campus besides winter sports teams.

**The Appeal**

135.    On December 19, 2018, John filed his appeal of the determination and sanction against him.  John's appeal cited the following procedural errors made by the Investigator:

A.  Refusal to consider the results of the polygraph test or the fact that John submitted to a polygraph test;
B.  Failure to consider inconsistencies in Sally's account;
C.  Failure to consider evidence of Sally withholding and fabricating evidence; and
D.  Failure to conduct appropriate follow-up investigation.

136.     John also raised concerns about the Investigator's bias in favor of Sally and against John, and about Sally being permitted to submit new (and false) evidence in her statement to the Sanctioning Panel.

137.     Notwithstanding that the request for review was submitted on December 19, and knowing that the hockey season resumed on December 26 and the Winter Term began on January 3, 2019, John still awaits a decision on his appeal.

**Pressure on Dartmouth to Respond Harshly to Allegations of Violence Against Women**

138.     Before, during, and since the pendency of the case against Plaintiff, significant attention at Dartmouth had and has been focused on the issues of violence against women and sexual misconduct.

139.     On April 4, 2011, Russlyn Ali, Assistant Secretary for Civil Rights at the U.S. Department of Education, issued a "Dear Colleague" letter to schools and universities setting forth the Department's position on schools' obligations to prevent and address sexual harassment and violence under Title IX. https://obamawhitehouse.archives.gov/sites/default/files/dear_colleague_sexual_violence.pdf.

140.     The now discredited Dear Colleague Letter included several procedural requirements and suggestions for schools to utilize in investigating and preventing sexual violence, and clarified that noncompliance with the Department's stated position on the issue could result in the loss of Federal funding.

141.     The Dear Colleague Letter states: "If a school knows or reasonably should know about student-on-campus harassment[5] that creates a hostile environment, Title IX requires the

---

[5] The use of the term "harassment" or "sexual harassment" in the Dear Colleague Letter includes "sexual violence." Dear Colleague Letter at 1, n. 2.

school to take immediate action to eliminate the harassment, prevent its recurrence, and address its effects." Dear Colleague Letter at 4.

142.    Regarding concurrent law enforcement investigations of sexual violence, the Dear Colleague Letter provides that "the school's Title IX investigation is different from any law enforcement investigation, and a law enforcement investigation does not relieve the school of its independent Title IX obligation to investigate the conduct." Id. "Police investigations may be useful for fact-gathering; but because the standards for criminal investigations are different, police investigations or reports are not determinative of whether sexual harassment violates Title IX." Id. at 10. "Schools should not wait for the conclusion of a criminal investigation or criminal proceeding to begin their own Title IX investigation and, if needed, must take immediate steps to protect the student in the educational setting." Id. "Although a school may need to delay temporarily the fact-finding portion of a Title IX investigation while the police are gathering evidence, once notified that the police department has completed its gathering of evidence . . . the school must promptly resume and complete its fact-finding for the Title IX investigation." Id.

143.    The Dear Colleague Letter includes the Department's position that schools must utilize a preponderance of the evidence standard in investigations of sexual violence, rather than a clear and convincing standard. Id. at 11 ("Grievance procedures that use this higher standard are inconsistent with the standard of proof established for violations of the civil rights laws, and are thus not equitable under Title IX.").

144.    The Dear Colleague Letter confirms that in a school's Title IX investigation, "the parties must have an equal opportunity to present relevant witnesses and other evidence," however "[the Department] strongly discourages schools from allowing the parties to personally

question or cross-examine each other during the hearing." Id. at 11-12.  The Dear Colleague

Letter does not mention whether schools may allow parties to submit questions to an investigator

who will then ask the other party.

      145.    On September 22, 2017, the Department issued a letter withdrawing the 2011

Dear Colleague Letter as well as the "Questions and Answers on Title IX and Sexual Violence"

issued April 29, 2014.  Letter from Candice Jackson, Acting Assistant Secretary for Civil Rights,

U.S. Dep't of Education, Sep. 22, 2017, available at

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.

      146.    In support of this action, the Department cited concerns that the 2011 and 2014

guidance documents led to "deprivation of rights" for students and that the Department had not

followed a formal public notice and comment process before issuing the 2011 and 2014 guidance

documents.  Id.

      147.    The Department acknowledged that the Dear Colleague Letter placed "improper

pressure upon universities to adopt procedures that do not afford fundamental fairness." Id.,

citing "Open Letter form the Members of the Penn Law School Faculty," Sexual Assault

Complaints: Protecting Complainants and the Accused at Universities, Wall St. J. Online (Feb.

18, 2015); "Rethink Harvard's Sexual Harassment Policy," Boston Globe (October 15, 2014)

(schools adopted procedures that "lack the most basic elements of fairness and due process, and

overwhelmingly stacked against the accused, and are in no way required by Title IX law or

regulation.").

      148.    In place of these documents, the Department issued a new question and answer

document – the September 2017 Q&A on Campus Sexual Misconduct – to guide institutions

while the Department conducts an official rulemaking process to promulgate new Title IX

regulations.  "Q&A on Campus Sexual Misconduct," U.S. Dep't of Education, September 2017, https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

149.    The new Q&A guidance makes clear the Department's expectation that the standard of evidence for school's investigations of sexual violence under Title IX be the same as the standard used in other disciplinary proceedings, thus requiring many schools to either raise the standard used in Title IX investigations, or lower the standard used in all other proceedings.

150.    The Q&A guidance also reversed the Department's previous controversial policy that required school to provide appeal rights to both complaining and responding parties equally.

151.    On November 29, 2018, the Department issued proposed regulation to implement Title IX.  "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," 83 Fed. Reg. 61462 (Nov. 29, 2018) ("Proposed Regulations"). The Proposed Regulations follow the Department's withdrawal of the 2011 Dear Colleague Letter and its own investigation of Title IX compliance in school sexual assault investigations and proceedings, which included discussions with various stakeholders.

152.    One of the stated goals of the Proposed Regulations is to "[e]stablish procedural safeguards that must be incorporated into a recipient's[6] grievance procedures to ensure a fair and reliable factual determination when a recipient investigates and adjudicates a sexual harassment complaint."  Id.

153.    As part of its own investigation into how recipients handle Title IX complaints, the Department reviewed various criticisms of the policies set forth under the Dear Colleague

---

[6] "Recipient," as used in the Proposed Regulations, refers to schools and universities who are recipients of Federal financial assistance.  Id. ("The proposed regulations would also specify how recipient schools and institutions covered by Title IX (hereinafter collectively referred to as recipients or schools) . . . .").

Letter and other previous guidance, including criticism "that those guidance documents pressured schools and colleges to forgo robust due process protections." Id. at 61464.

154.    Deficiencies in recipient responses to Title IX complaints identified by the Department include "lack of notice to the parties, lack of consistency regarding both parties' right to know the evidence relied on by the school investigator and right to cross-examine parties and witnesses, and adjudications reached by school administrators operating under a federal mandate to apply the lowest possible standard of evidence." Id.

155.    Due process protections and other requirements set forth in the Proposed Regulations include (with citation to proposed rule number):

A.    Complainants and respondents must be treated equitably (34 CFR § 106.45(b)(1));

B.    Credibility determinations may not be based on a person's status as a complainant, respondent, or witness (§ 106.45(b)(1));

C.    Notice of allegation provided to the parties must include sufficient details known at the time, including the identities of the parties involved in the incident, if known, the specific section of the recipient's code of conduct allegedly violated, the conduct allegedly constituting sexual harassment, and the date and location of the alleged incident, if known (§ 106.45(b)(2));

D.    Grievance procedures must require an objective evaluation of all relevant evidence, including both inculpatory and exculpatory evidence (§ 106.45(b)(1)(ii));

E.    Grievance procedures must provide an equal opportunity for the parties to present witnesses and other inculpatory and exculpatory evidence (§ 106.45(b)(3)(ii));

F.    Grievance procedures must provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility, so that each party can meaningfully respond to the evidence prior to the conclusion of the investigation (§ 106.45(b)(3)(iii)); and

G.    Grievance procedures must include a live hearing at which the parties must be permitted to cross-examine each other and all other witnesses (§ 106.45(b)(3)(iv).

156.    Dating at least back to 2013, student groups and others have criticized and put pressure on Dartmouth in the form of protests and demonstrations over Dartmouth's handling of sexual assault allegations.

157.    In response to the pressure, Dartmouth canceled classes and instituted alternative programming centered around the issues raised by the protesters.

158.    In 2014, former Dartmouth College Dean Rebecca Biron published an article titled "BEHIND CLOSED DOORS: RAPE, MURDER, AND THE MISPLACED CONFIDENCE OF MEN."

159.    The article expressed an assumption that men are violent, stating: "[w]hat makes it so hard for some men to question their own assumptions and so easy for them to act boldly and brutally when faced with closed doors?"

160.    In that article, Dean Biron equated a Dartmouth undergraduate student who was acquitted by a jury of allegations of non-consensual sex with a classmate to Oscar Pistorius, the South African athlete who admitted to shooting and killing his girlfriend.

161.    Dean Biron concluded her article by stating: "We must demand of men, whether in college or not, a bit more self-doubt and a bit less self-confidence when they are faced with closed doors, whether they be physical, verbal, or figurative. The legal system values epistemological humility in order to protect the innocent; individuals should too."

162.    Dean Biron stepped down as the Dean of Dartmouth College as of June 30, 2018.

163.    She was succeeded by Professor Kathryn Lively, a professor of sociology, who was appointed interim dean of the College starting July 1, 2018.

164.    Dean Lively's research and teaching focus on emotion, identity, face-to-face interaction, social psychology, and gender studies.

165.    Dean Lively is reported in The Dartmouth to have said that her vision for the role of Dean has been shaped by her predecessor.  Specifically, "It will be a very hard task to fill Rebecca Biron's shoes," Lively said.  And, she said, "Through [Dean Biron], I've learned to keep my eye on the bigger picture and to remember why it is that we do this work.  She's been inspirational."

166.    From 2016 through October 26, 2018, Dartmouth's student paper, The Dartmouth, published more than thirty articles about sexual misconduct, most focused on instances of sexual misconduct at Dartmouth and Dartmouth's handling of those incidents.

167.    In February 2017, as reported by The Dartmouth, Dartmouth students staged performances addressing violence against women.

168.     In March 2017, as reported by The Dartmouth, the federal government opened its third investigation into Dartmouth's handling of sexual misconduct cases. The first two complaints to the federal government were filed by students in 2013 and 2015, [and remained open at the time the third complaint was filed].

169.    In May 2017, as reported by The Dartmouth, there were numerous incidents of threats of violence against female students at Dartmouth.

170.    As reported by The Dartmouth, students staged a rally to speak out about sexual violence on campus in response to the threats against Dartmouth women.

171.    President Phil Hanlon responded to the May 2017 incidents by stating "sexual assault, gender-based harassment, interpersonal violence and stalking have no place in our community."

172.    In June 2017, the Senior Survey published in The Dartmouth noted that "[s]exual assault policy has proved a very salient issue over the last four years.  Fifty-one percent of

seniors thought sexual assault prevention efforts were not very effective or not at all effective during their time at Dartmouth; 31 percent said they were somewhat effective and only 4 percent said very effective. More students were also dissatisfied (45 percent) with the amount of attention and resources devoted to preventing sexual assault from the College and other organizations than were satisfied (35 percent)."

173.    In May 2018, just after Green Key weekend, there was a robust student debate in The Dartmouth over what actually constitutes consent for purposes of sexual activity in response to members of the sexual assault prevention groups Movement Against Violence and the Student and Presidential Committee on Sexual Assault placing signs on campus stating that "Unenthusiastic consent is not consent."  The student-written pieces largely discussed the prevalence of sexual assault on Dartmouth's campus, discounted allegations of false reports, and urged Dartmouth to take greater action to prevent sexual assault on campus.

174.    In June 2018, The Dartmouth published another Senior Survey focusing attention on Dartmouth's sexual assault policies, noting that "female students express lower satisfaction" with Dartmouth's efforts than male students.

175.    In August 2018, The Dartmouth reported another student demonstration where students chanted, "rapists are not welcome here," and expressing "solidarity with survivors of sexual violence," and "stress[ing] the necessity of supporting survivors and holding offenders accountable."  One student expressed "that she was tired of the fact that the fear of being accused of sexual assault has sometimes been taken more seriously than the actual victims of sexual assault . . ."

176.    In September 2018, The Dartmouth published an article entitled "A retrospective on discussions surrounding sexual assault," summarizing the atmosphere at Dartmouth as follows:

> Like at many colleges across the United States, sexual misconduct has become a significant source of discussion for both administrators and students at the College in recent years. Many student groups actively work to promote discussions about the topic and to eradicate sexual violence on campus. Administrators have implemented numerous policies and programs to combat sexual misconduct, earning the College an award for excellence in preventing sexual assault in 2017. Despite these measures, however, sexual misconduct has continued, sometimes forcing Dartmouth into the national media spotlight.

177.    The article relates that in 2014, in response to an inappropriate post on a message board and sexual assault allegations on campus, a student activist organization "created a petition encouraging Dartmouth to make concrete changes to its methods of addressing these instances of sexual assault.  The petition, which gained 50,000 signatures, told the College, 'Sexual assault is serious.  Treat it that way.'"

178.    According to the article, the petition suggested "that students found guilty of sexual assault be expelled."

179.    The article quotes current Dartmouth Title IX coordinator, Kristi Clemens, as saying, "We have really since 2014 ramped up how we talk about sexual misconduct, both in reporting and in expectations."

180.    The article reported that "Clemens finds reassurance of the College's progress [in sexual assault policy]" in the fact that reported incidents are on the rise and that Dartmouth was "third in the United States for reported rapes in 2014 . . . ."  She said, "We know from national data that sexual assault is happening on all college campuses . . . . If we're seeing more reports,

that's actually a good thing because then we're getting resources to those reporting parties where we're going through potentially a conduct hearing and holding people accountable for harming others in the community."

181.    On September 28, 2018, in the midst of the U.S. Senate hearings regarding the nomination of Justice Brett Kavanaugh to the U.S. Supreme Court, the leadership of Dartmouth's Student Assembly sent an email to all undergraduate students at Dartmouth with the subject line "Dr. Ford: We believe you."  The body of the email presented an example of the pervasive view at Dartmouth that accusers of sexual assault are to be believed simply because of their status as accusers:

> Following yesterday's Senate hearing, we, the members of Student Assembly, want to express our admiration for Dr. Christine Ford and her tremendous bravery - we believe you, Dr. Ford. You have made your voice heard at immense personal cost, and in doing so, you have empowered survivors everywhere with an untouchable example of courage and resolve.
>
> It is unfortunate and revealing that telling your story has required such courage. All of us should take note of the ways we contribute to a society where survivors of sexual assault feel systematically silenced.

182.    In November 2018, The Dartmouth reported that Dartmouth was in the national news when seven women filed a $70 million lawsuit against the College for ignoring over 16 years of sexual harassment by three male professors.  There were similar articles in news outlets across the country, including an article in Rolling Stone Magazine on November 15, 2018.

183.    On December 3, 2018, The Dartmouth published an article entitled "Alumni question donating after sexual harassment lawsuit."  In the article, several regular female donors state that they will not donate money to Dartmouth as a result of the allegations set out in the lawsuit.  One donor is organizing an open letter to be circulated among alumni and released in

January.  Another donor said that she would not donate to Dartmouth unless Dartmouth "close[s] its fraternities."

184.    An article in The Dartmouth published December 10, 2018, focuses on the lawsuit and criticizes Dartmouth's "practices concerning sexual assault survivors," focusing solely on female survivors, and concludes by saying, "The administration knows that if they don't do anything, it's not good public relations for them . . . As disturbing as it is that that's kind of a necessity, it's helpful right now for us to get things that really need to change to change, now that the College is listening."

185.    On December 12, 2018, the day that John Doe was sanctioned by Dartmouth, President Hanlon sent an email to Dartmouth students, faculty, and staff providing a statement on the lawsuit.  In the email, President Hanlon states: "We owe it to the students who came forward in 2017, as well as to past generations of Dartmouth **women** and current and future students, faculty, and staff, to make our community the best it can be."  (Emphasis added).

186.    Another article in The Dartmouth published on December 17, 2018 describes a "letter in support of sexual harassment plaintiffs," that comes from a group called the Dartmouth Community Against Gender Harassment and Sexual Violence, again, solely focusing on female plaintiffs, that was signed by "nearly 800 alumni, current undergraduate and graduate students, faculty, staff and other members of the Dartmouth community," which was presented to College President Phil Hanlon and the Board of Trustees on December 6, 2018, during the pendency of Doe's proceedings at Dartmouth.  In the letter, students and alumni openly criticize Dartmouth for being biased against women in its consideration of sexual assault complaints. In response, President Hanlon sent a community-wide email assuring the recipients, "We unequivocally share the goal of the women who brought the lawsuit," against the three professors, and promising "a

'sweeping plan' to combat sexual assault on campus, citing steps already taken in the 2015 Moving Dartmouth Forward campaign and the 2016 Inclusive Excellence campaign."

187.    On January 1, 2019, the Boston Globe published an article titled "After sexual harassment case, what's next for Dartmouth College?", in which it discussed reactions to the lawsuit brought against Dartmouth regarding alleged sexual harassment by the psychology professors.  Diana Whitney, spokeswoman for the Dartmouth Community Against Gender Harassment & Sexual Violence, was quoted: "There needs to be a really broad cultural change at the institutional level . . . We don't see this is as an isolated incident at Dartmouth."  Whitney's group plans to send a letter to Dartmouth administrators this month outlining proposed changes. The article reports that in response to the lawsuit and the reaction thereto, President Hanlon has promised a "sweeping plan" to be unveiled this month; the article reports that "a committee has been working on recommendations for more than a year."  The article confirms prior reporting that "alumni have expressed frustration and threatened to withhold donations over the handling of the case."

188.    On January 3, 2019, on the first day of the Winter Term, President Hanlon sent an email to Dartmouth students, faculty and staff unveiling Dartmouth's new Campus Climate and Culture Initiative ("C3I"), which "will seek to foster healthy, professional, and nurturing relationships among faculty, staff, and students.  President Hanlon explained that C3I "embrace[s] and expand[s] upon the recommendations for institutions of higher education made in a groundbreaking report . . . from the National Academies of Sciences, Engineering, and Medicine (NASEM), called 'Sexual Harassment of **Women**: Climate, Culture, and Consequences in Academic Sciences, Engineering, and Medicine.'"  (Emphasis added). President Hanlon also announced that Dartmouth would be revising its sexual misconduct policy,

establishing mandatory Title IX training for faculty, staff, post-doctoral scholars, and graduate and professional students, and expanding the capacity of its Title IX office.  The same day, the Boston Globe published an article entitled "Dartmouth College outlines steps to address sexual harassment," publicizing Pres. Hanlon's email to the Dartmouth community, and stating that a student and alumni group called the Dartmouth Community Against Gender Harassment and Sexual Violence, "had demanded that administrators change the 'broader culture that permits sexual misconduct to recur.'"

189.    It was against this politically charged backdrop of three pending federal investigations, numerous articles and complaints criticizing Dartmouth's process for handling sexual assault complaints, student and alumni group demonstrations and letters to the President and Board of Trustees criticizing the handling of sexual assault allegations by female students, the wave of criticism brought about by the November 2018 lawsuit, and the news of decreased and withheld alumni donations that Dartmouth investigated the allegations against John Doe and expelled Doe from the school.

<u>**Consequences of Dartmouth's Decision**</u>

190.    If Dartmouth's expulsion of John is allowed to remain, John will be irreparably harmed.

191.    The expulsion from Dartmouth will significantly affect John's undergraduate career.  The decision from the Sanctioning Panel came too late into the 2018-2019 academic year for John to be able to submit transfer applications to other schools for the Spring 2019 semester. As a result, John will not be able to transfer into another school until the Fall 2019 semester. This gap in John's education will need to be explained to future employers, which may require disclosure of his expulsion.

192.    The fact that John has been expelled - and the reason therefore - also place in doubt his ability to transfer to another school.  Without redress from this Court, John's transfer application to any school will have to disclose the expulsion from Dartmouth, which will weigh against his admission.

193.    If John's expulsion is allowed to remain, his internship for the Summer of 2019 will be revoked.  As a consequence, John will be deprived of the almost guaranteed future job offer from his internship placement and will certainly be deprived of his right to earn such an offer.

194.    NCAA student-athletes are allowed to compete for four seasons in one sport and, for Division 1, have five calendar years in which to play four seasons of competition.

195.    With limited exceptions, Division 1 student-athletes "who compete for any amount of time during a season use up one season in their sport". <u>See</u>, http://www.ncaa.org/student-athletes/current/transfer-terms.

196.    John has already played in nine games for Dartmouth in the 2018-2019 season. Accordingly, he would not be eligible to play for another Division 1 school's ice hockey team for the 2018-2019 season and would lose an entire year of eligibility if required to transfer. Furthermore, transferring to any other Division I ice hockey program requires sitting out an entire season. This means that the next full season John could possibly suit up is 2020-21, which is after his projected graduation date. John would have to further delay his graduation in order to play college hockey again or find a way to enroll in a graduate program, which would extend the time before he could either play professional hockey or embark on his career in finance.

197.    Division 1 college hockey programs assemble their rosters for incoming classes anywhere from one to four years before a given class of recruits enters the school and the ice hockey program.

198.    Because Division 1 hockey rosters are planned and built through high school and junior hockey recruitment years in advance, transfer opportunities for upperclassmen are limited.

199.    If John is expelled from Dartmouth, he will be deprived of the opportunity to participate in college ice-hockey, perhaps permanently, but certainly on a continuous and uninterrupted basis.

200.    John has played hockey his entire life.  Being deprived of the experience, including the joy of competition, the camaraderie of teammates and other intangible benefits of athletics is all irreplaceable and unremediable with mere money.

201.    In addition to the far more damaging experiential loss of participation in hockey, John will also lose the attendant benefits of being a student athlete at a Division 1 school, including free tutoring and academic advising, athletic, strength and nutritional training, leadership training, career advising and placement, and the opportunity to travel around the country.

202.    Without appropriate redress the unfair outcome of Dartmouth's flawed disciplinary process will cause irreparable harm to Plaintiff by not permitting him to complete his education at Dartmouth, impairing his ability to continue his education elsewhere, depriving him of a year of athletic eligibility and the accompanying benefits, and impacting his ability to work in his chosen field should he complete his bachelor's degree.

## CAUSES OF ACTION

## I. Title IX

203.     John Doe repeats and realleges the allegations above as if fully set forth herein.

204.     Pursuant to Title IX of the Education Amendments of 1972, Dartmouth is prohibited from subjecting John to a disciplinary proceeding where sex is a motivating factor in the decision to impose sanctions.

205.     Pursuant to Title IX of the Education Amendments of 1972 Dartmouth is further prohibited from providing a disciplinary proceeding that is not prompt or equitable.

206.     Upon information and belief, at least one Dartmouth administrator involved in John's case looked to continue the actions of her predecessor who held the belief that men are inherently violent, and that women making accusations of sexual misconduct are to be believed, even if a jury has found their story to lack credibility.

207.     Further, the Title IX coordinator expressed that she believed increased reporting of sexual assault to be a positive development so that Dartmouth could hold more people accountable.

208.     Dartmouth felt undue pressure from the federal government, campus student groups, the national media, and alumni donors to support female reporters by finding male responding parties responsible for committing sexual assault.

209.     Dartmouth's employees made incorrect determinations of fact, ignoring substantial evidence presented that supported John's innocence and undermined Sally's claims against him, resulting in an erroneous outcome in his case.

210.     Dartmouth failed to investigate a substantiated claim that Sally fabricated evidence and was otherwise dishonest in the course of the investigation in violation of Dartmouth's Unified Disciplinary Procedures when John presented documentary evidence of Sally's violations, which, when viewed in conjunction with the significant procedural and

substantive errors and in the atmosphere of pressure from the Federal Government, students, and the media to respond to sexual assault allegations made by female complainants, constituted selective enforcement of the Unified Disciplinary Procedures.

## II. Breach of Contract

211.    John Doe repeats and realleges the allegations above as if fully set forth herein.

212.    John paid Dartmouth sums of money for his education, and in return, the University contracted to provide John with access to its undergraduate degree program.

213.    The relationship between the parties is contractual in nature, and each party owes the other certain duties, some of which can be found in Dartmouth's written policies.

214.    By the facts alleged herein, Dartmouth breached its contract with John by instituting and prosecuting an investigation and adjudication in violation of its policies and procedures.

215.    Additionally, by the facts alleged herein, Dartmouth breached its contract with John by instituting and implementing an investigation and adjudication that did not comport with basic elements of fundamental fairness, including procedural and substantive fairness.

216.    As a direct and proximate result of that breach plaintiff suffered the harms described above.

## III. Breach of Covenant of Good Faith and Fair Dealing

217.    John Doe repeats and realleges the allegations above as if fully set forth herein.

218.    Every contract contains within it an implied covenant of good faith and fair dealing.

219.    By the facts alleged herein, Dartmouth breached that covenant by pursuing that investigation and adjudication in an unfair and biased manner.

220.    As a direct and proximate result of that breach John suffered the harms described above.

## IV. Negligence

221.    John Doe repeats and realleges the allegations above as if fully set forth herein.

222.    Dartmouth had a duty of care, imposed on it by its policies and voluntarily undertaken, to handle allegations of sexual misconduct and/or violence fairly and consistently.

223.    By the facts alleged herein, Dartmouth breached that duty by pursuing its investigation and adjudication in a manner that deviated from its policies, and was unfair and biased.

224.    As a direct and proximate result of that breach John suffered the harms described above.

*        *        *

WHEREFORE, John Doe respectfully requests that this Court enter judgment against defendant on all counts of this complaint. John further requests that this Court:

1.    Issue a preliminary injunction enjoining Dartmouth from enforcing John's expulsion and ordering it to allow him to remain on campus, attend classes, and participate in all campus activities pending the outcome of the Dartmouth appeal, and alternatively, if the appeal is adversely decided, pending the outcome of this action;

2.    Order defendant to reverse its finding that John violated its policies, and expunge his record;

3.    Order defendant to reinstate John as a student in good standing;

4.    Award John damages and enhanced compensatory damages in an amount to be determined at trial;

5.      Award John the reasonable costs of this action, including attorneys' fees;

6.      Grant such other and further relief as this Court deems equitable and just.

**PLAINTIFF DEMANDS A TRIAL BY JURY**

## **VERIFICATION**

I, John Doe, declare as follows:

1.      I am the plaintiff in this action.

2.      I have personal knowledge of the facts set out in the foregoing Verified Complaint and Jury Demand, and if called upon to testify I would competently testify as to the matters stated herein.

3.      I verify under penalty of perjury under the laws of the United States of America that the factual statements in this Verified Complaint and Jury Demand and true and correct.


Date: January 7, 2019                                   _____/s/ John Doe_____
                                                                      John Doe

Date: January 7, 2019                    Respectfully submitted,

                                         /s/ William E. Christie
                                         WILLIAM E. CHRISTIE
                                         NH Bar #11255
                                         S. AMY SPENCER
                                         NH Bar #266617
                                         ALEXANDER W. CAMPBELL
                                         NH Bar# 268958
                                         SHAHEEN & GORDON, P.A.
                                         107 Storrs Street
                                         Concord NH 03302
                                         (603) 225-7262
                                         wchristie@shaheengordon.com
                                         saspencer@shaheengordon.com
                                         acampbell@shaheengordon.com

                                         *Attorneys for plaintiff John Doe*