UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| JOHN DOE,<br><br>                    Plaintiff,<br><br>          v.<br><br>TRUSTEES OF DARTMOUTH COLLEGE,<br><br>               Defendant. | Civil Action No.: 1:19-cv-00013-JL |

## PLAINTIFFS PROPOSED FINDINGS OF FACT AND RULINGS OF LAW

In accordance with this Court's Procedural Order of January 9, 2019, Dkt. No. 12,

plaintiff John Doe files the following Proposed Findings of Fact and Rulings of Law relevant to

his request for preliminary injunctive relief.

## PROPOSED FINDINGS OF FACT

### The Parties

1.      John Doe is a U.S. citizen who resides outside of New Hampshire. At all times

relevant to this complaint he was a student at Dartmouth College.

2.      Defendant Trustees of Dartmouth College is a partially federally-funded private

liberal arts college in Hanover, New Hampshire.

3.      John grew up and currently lives in Massachusetts. John went to high school in

Massachusetts and graduated *cum laude.*

4.      Prior to Dartmouth's decision to expel him, John was a junior at Dartmouth on

track to graduate in the Spring of 2020.

1

5.     John was enrolled at Dartmouth in the Economics program. As of the completion of the Fall 2018 term, he had a 3.52 GPA.

6.     John played on Dartmouth's hockey team. Hockey has been a significant part of John's life since he was a child. In accordance with his commitment agreement with Dartmouth, John took a year off between graduating high school and starting at Dartmouth to play junior hockey. John's success as a hockey player was a contributing factor to his admission at Dartmouth.

**John Doe's Background and Goals**

7.     Following the completion of his undergraduate degree, John intends to pursue a career in professional hockey and a career in finance on Wall Street.

8.     John has been accepted to an internship for the summer of 2019. Prorated, his salary in this position is the equivalent of $85,000 per year with the opportunity to earn a signing bonus of $5,000. Upon successful completion of this internship, the employer would offer John a full-time position after graduation. If John is expelled from Dartmouth, he loses this internship and career opportunity.

9.     Dartmouth has been paid $23,389.88 for John Doe to enroll in the Winter 2019 Term that began on January 3, 2019, and John is fully enrolled in classes.

**John Doe's Interactions with Sally Smith**

10.     From May 15, 2018 through May 19, 2018, John Doe and Sally Smith exchanged text messages in which they discussed Green Key Weekend and John anticipating a place to stay one or more nights while he was on campus.

11.     A complete set of the test messages are attached as Exhibit A to the Verified Complaint and are summarized at ¶¶ 37-42 of the Verified Complaint.

**The Underlying Incident**

12.     On or about May 19, 2018, John Doe and Sally Smith were together in Sally Smith's dorm room at Dartmouth.

13.     Sally states that John had sexual intercourse with her without her consent.

14.     John denies that they engaged in sexual intercourse.

**Sally Smith's Complaint to Dartmouth**

15.     On Sunday, May 20, 2018 at 1:05 p.m., Sally Smith emailed Dartmouth's Title IX office stating that "there was an incident last night."

16.     On May 21, 2018, Sally met with Dartmouth's Title IX coordinator, Kristi Clemens, to discuss the incident and made an official report. Ms. Clemens made a record of Sally's report that day.  The incident was reported to the Hanover Police Department shortly thereafter, and the Hanover Police commenced its own investigation.

17.     Sally scheduled an appointment with Dartmouth's College Health Services for Thursday, May 24, 2018 to obtain a Sexual Assault Nurse Examiner (SANE) exam, she failed to show up for her appointment and undergo the SANE exam.

18.     Following the report to the police, Dartmouth was asked to suspend its investigation while the Hanover Police conducted its investigation.

19.     On July 2, 2018, John met with a Hanover PD officer to discuss Green Key.  John was not apprised of any allegations against him at that time.

20.     In the beginning of July 2018, the Hanover Police gave Dartmouth permission to proceed with its Title IX investigation.

21.     As of the date of this filing, no criminal charges have been brought against John resulting from the complaint made to the Hanover Police.

**Dartmouth's Unified Disciplinary Process**

22.     Dartmouth investigates and administers discipline for allegations of sexual assault in accordance with its Unified Disciplinary Procedures for Sexual Assault ("Unified Disciplinary Procedures"). A true and accurate copy of the Unified Disciplinary Procedures is filed under seal with the Court as Exhibit B to Dartmouth's Opposition to the Motion for Temporary Restraining Order, and is incorporated herein by reference.

23.     The Unified Disciplinary Procedures governed the investigation and proceedings in this matter.

24.     The scope and timing of the investigation depends upon several factors, including "whether ongoing fact gathering by the police requires a temporary delay in further factual investigation by the College."  Unified Disciplinary Procedures at V.A.

25.     The Unified Disciplinary Procedures provide, "Upon initiating the investigation, the Director of Judicial Affairs will send the Reporting Person and the Responding Person a notice of investigation which will include: a copy of the charge; the name and contact information of the Investigator; and a copy of this policy. The Director of Judicial Affairs will also inform both parties of Dartmouth's policy which prohibits Retaliation." *Id.* at V.B.1.f.

26.     The Unified Disciplinary Procedures provide, "The investigation will be conducted in a prompt, fair, thorough, and impartial manner by a person who has specialized training in conducting Sexual Assault investigations. It will include, at a minimum, speaking separately with the Reporting Person, the Responding Person and pertinent witnesses, and soliciting and reviewing documentation relevant to the investigation including available police reports. The Reporting and Responding Persons will not be permitted to directly question each other and will not be required to be present together at any point. Each party may have an

4

advisor and/or an observer present with them at all meetings concerning the investigation." The Unified Disciplinary Procedures do not provide for a live hearing.  *Id.* at V.B.1.g.

27.     The Unified Disciplinary Procedures provide, "All parties and witnesses are obligated to be completely honest during the course of the investigation. Any person who knowingly makes a false statement in connection with the investigation may be subject to College disciplinary action. False statements include statements that omit a material fact, as well as statements that the speaker knows to be untrue."  *Id.* at at V.B.1.h.

28.     The Unified Disciplinary Procedures provide, "The College will … comply with valid requests by law enforcement for cooperation in a criminal investigation and may need to delay temporarily an investigation under this policy while law enforcement is in the process of gathering evidence. Once law enforcement has completed its gathering of evidence, the College will resume and complete its investigation. If the Reporting Person wishes to pursue disciplinary charges under this policy while criminal proceedings are pending or if the College determines that disciplinary proceedings should proceed, the College will not wait for the conclusion of the criminal case to proceed with the disciplinary process. If the College finds that Sexual Assault occurred, it will take effective steps to end it, prevent its recurrence, and address its effects, regardless of whether external legal proceedings are pending." *Id.* at VI.D

29.     The Unified Disciplinary Procedures provide, "Preservation of information and tangible material relating to Sexual Assault is essential for both law enforcement investigations and campus disciplinary investigations.  Therefore, Reporting Persons, Responding Persons, witnesses, or others reporting possible violations of this policy, are encouraged to preserve all information and tangible material relating to the incident. Examples include electronic communications (e.g., e-mails and text messages), photographs, clothing, bedding, and medical

information. In the case of medical information, prompt examinations can be crucial." *Id.* at
IV.D.

30.     Under the Unified Disciplinary Procedures, the parties are permitted to submit
information and identify potential witnesses both prior to the preparation of the Investigator's
factual findings and following the submission of the draft factual findings to the parties for their
review. *Id.* at V.B.1.i.

31.     The Unified Disciplinary Procedures provide, "The Investigator may record by
electronic, stenographic, or other means any meeting, to the extent permitted by law. If a
recording has been made, the Reporting and Responding Persons may request permission to
listen to the recording at the conclusion of the investigation. The Director of Judicial Affairs will
determine the conditions under which persons will have access to the recording in order to
preserve confidentiality. Persons who fail to abide by the Director's restrictions may be subject to
further disciplinary action. Except as provided above, no photographs, tape recordings,
videotapes, stenographic records, or other recordings of proceedings under this policy may be
made." *Id.* at V.B.1.j.

32.     The Unified Disciplinary Procedures provide, "The Investigator will prepare a
written report at the conclusion of the investigation. Before the report is finalized, the
Investigator will give the Reporting Person and the Responding Person an opportunity to review
a draft of the factual findings of the report and submit comments in writing. The Investigator will
then make any modifications to the draft report that the Investigator, in their judgment, deems
appropriate, and finalize the report." *Id.* at V.B.3.

33.     Following a finding of misconduct by the Investigator, the Reporting and
Responding Persons are permitted to "submit a statement of position to the Sanctioning Panel by

providing a copy to the Director of Judicial Affairs within five (5) calendar days after the Director has notified them of the Investigator's determination of responsibility." *Id.* at V.B.4.

34.     The Unified Disciplinary Procedures provide, "The sanction shall be separation from the College (i.e., expulsion) where: the Investigator has determined that the Responding Person, by use of physical force, threat, or Intentional Incapacitation of the Reporting Person, engaged in either (A) any form of sexual penetration (anal, oral, or vaginal), however slight, by a body part or object; or (B) oral-genital, oral-anal, or genital-genital contact…. In  cases not covered by [the preceding language], where the Investigator has determined that the Responding Person intentionally engaged in any form of sexual penetration or oral-genital, oral-anal, or genital-genital contact, as described above, there is a strong presumption that the sanction will be separation from the College."  *Id.* at V.B.4.i.

35.     Under the Unified Disciplinary Procedures, either party may request an appeal. "A party may only request review on the following grounds: [1] That the Investigator or the Sanctioning Panel committed procedural error which materially prejudiced the party requesting review's case; [2] That the Investigator's findings or the Sanctioning Panel's decision should be reconsidered because of newly discovered information which was not reasonably available to the party requesting review during the investigation and which would likely have affected either the finding of responsibility or the sanction imposed had it been available; or [3] That the sanction imposed is excessive, insufficient, or inappropriate." *Id.* at V.B.6.a. In considering an appeal, the Provost designates a "Reviewing Official" who consults with the Dean of the school of both the reporting and responding person in rendering a decision.  "If the Reviewing Official decides that the request states an allowable ground for review, they will notify the parties that the request will be considered and invite the other party to submit, within seven (7) days, a statement and

supporting materials in response to the submission of the party requesting review." *Id.* at V.B.6.b. c.

36.      Under the Unified Disciplinary Procedures, "The College reserves the right, pending the review, to direct that a Student found responsible for violation of this policy, and for whom the sanction of suspension or separation has been imposed, be required to leave campus during the time the review is pending. This decision will be made by the Dean of the College (in the case of undergraduate Students)…." *Id.* at V.B.6.d.

37.      The Unified Disciplinary Procedures states that they "will apply to all complaints of conduct regulated by this policy made by students, faculty, staff, or third parties, and will take precedence over any other Dartmouth policies and procedures with respect to such complaints."

## Dartmouth's Standards of Conduct

38.      The Unified Disciplinary Procedures defines "sexual assault" as "unwanted or unwelcome touching of a sexual nature, including: fondling; penetration of the mouth, anus, or vagina, however slight, with a body part or object; or other sexual activity that occurs without valid Consent."

39.      The Unified Disciplinary Procedures defines "consent" as:

[C]lear and unambiguous agreement, expressed in mutually understandable words or actions, to engage in a particular sexual activity. Whether valid consent has been given will be judged based upon what a reasonable person would have understood from such words or actions. Consent must be voluntarily given and is not valid:

1. If obtained by physical force, coercion, or threat;
2. When a person is Incapacitated; or
3. When an intellectual or other disability prevents a person from having the capacity to give consent.

Consent to engage in one sexual activity, or agreement to engage in a particular sexual activity on a prior occasion, cannot be presumed to constitute consent to

engage in a different sexual activity or to engage again in a sexual activity.
Consent can be withdrawn by either person at any point.

### The Investigation

40.     On July 5, 2018, Dartmouth's Director of Judicial Affairs, Katherine Strong,

provided a letter to John notifying him of Dartmouth's investigation and stating:

> It has been determined that the report of sexual misconduct made to Title IX Coordinator
> Kristi Clemens should be referred for further investigation. Specifically, it is alleged that
> on or about May 19, 2018 you engaged in sexual intercourse with [Sally Smith] '20
> without her consent. This behavior would be in violation of Dartmouth's Community
> Standards of Conduct III.

41.     The letter also notified John that Sara Hellstedt had been named as the

investigator for the matter ("Investigator"). Included with the letter was a Statement of

Understanding, which John signed on July 13, 2018.

42.     Ms. Hellstedt is an attorney in the law firm Bernstein Shur.

43.     In July 13, 2018, in the Statement of Understanding, John identified his advisor

and his observer.

44.     In a letter dated July 20, 2018, John's advisor sent the Investigator a four-page

letter on behalf of John providing John's list of witnesses, a copy of all the text messages

between himself and Sally, and John's summary of evidence.  John identified seven witnesses.

45.     On July 12, 2018, Dartmouth issued no-contact orders to both Sally and John.

While there was a typographical error in John's order, ordering him not to have contact with

himself, the Title IX Coordinator met in person with John to deliver the order, and during that

meeting she was clear verbally that the order required him to have no contact with Smith.  There

is no allegation that John has violated the no contact order.

46.     On July 18, 2018, Sally  met with the Investigator and provided some excerpts of

the text messages between her and John.  Also present were Sally's advisor and observer.

47.     On August 1, 2018, John met with the Investigator for an interview.  He was accompanied by his advisor, who is an attorney, and his observer.   On August 17, 2018, John again met with the Investigator for a follow-up interview. John was accompanied by his advisor and his observer.  John and his advisor asked the Investigator if they could record the interviews. After speaking with the Director of Judicial Affairs, Katherine Strong, the Investigator denied them permission to record the interviews.

48.     During the interviews, John denied having sexual intercourse with Sally.

49.     On August 22, 2018, John submitted a letter to the Investigator, which states his position regarding Sally's allegations, requests certain discovery from Dartmouth, and clarifies certain of his responses to questions asked during the August 17 interview.  He also requested additional information about the allegations against him so that he could "defend [him]self knowingly against the[] accusation(s)" and "participate meaningfully in [the] investigation."

50.     On August 31, 2018, Katharine Strong, Director of Judicial Affairs, emailed John confirming Dartmouth's position that it had provided adequate notice of the allegations against him.  She wrote:

> 1)     Notification of the allegations under review: You were given notification of the allegation under investigation in the notification packet provided to you at your meeting with Adam Knowlton-Young and Kristi Clemens on July 5, 2018. You were also given the opportunity to respond to that allegation in your Statement of Understanding which you returned to our office, denying the allegation.
>
> 2)     Access to interview transcriptions and evidence under review: You will receive access to the transcribed interviews and evidence when the draft report is made available to you. The *Unified Disciplinary Procedures* which guide our process state:
>
> *The Investigator will prepare a written report at the conclusion of the investigation. **Before the report is finalized**, the Investigator will give the Reporting Person and the Responding Person an opportunity to review a draft of the factual findings of the report and submit comments in writing.*

> *The Investigator will then make any modifications to the draft report that the Investigator, in their judgment, deems appropriate, and finalize the report.* (Emphasis added).
>
> This report is shared with the responding and reporting students at conclusion of the investigator's interviews and evidence review but prior to the making of a decision about responsibility. All evidence considered by the investigator, including transcripts of interviews conducted, will accompany the report.  You will have the opportunity to review the report, the exhibits, and to assess what the investigator has found to have occurred.  You may offer clarification, additional information, alternative interpretations, etc., as well as request any additional investigation that you believe is appropriate.  The investigator will assess all such information and conduct appropriate follow up if warranted before her report is finalized.

51.     The Investigator conducted interviews of all the seven witnesses John named in his July 20, 2018 letter, in addition to five other witnesses.

**The Investigator Failed to Properly Consider That Sally Submitted Falsified Evidence**

52.     In her initial interview with the Investigator, Sally Smith agreed to provide all of her text messages with John Doe to the Investigator.

53.     In her submission to the Investigator, Sally included text messages between her and John from Saturday, May 19, 2018.  However, the text messages she submitted were not complete.  Rather, the messages Sally submitted were edited to remove or change certain statements.

54.     Sally did not submit a complete set of the text messages between her and John from the weekend in question.

55.     Sally told the police that John initiated a text exchange with her the morning after the incident.  This statement was untrue.

56.     The investigator did not examine or confront Sally about her statement to the police or the altering of texts.

11

57.     The complete set of text messages and the test messages submitted by Sally are set forth in Exhibit A to the Verified Complaint and are summarized at ¶¶ 76-80 of the Verified Complaint.

58.     On November 28, 2018, John brought the issue of Sally's doctored text messages to the Investigator's attention.  On November 29, the Investigator stated in response: "I have received the complete set of text messages between you and [Sally] that you provided early in the investigation, and compared them to the subset of text messages [Sally] provided when I met with her.  As a result, no further investigation into the matter is necessary."

59.     Sally was not disciplined for providing falsified evidence to the Investigator, nor did the Investigator appear to discredit any statements or accounts given by Sally in light of her presenting false evidence.

60.     Considering that Sally submitted doctored text messages to the Investigator, John is not aware of any efforts by Dartmouth to ascertain whether other evidence she submitted was not similarly manipulated.

**The Polygraph**

61.     On July 25, 2018, John took a polygraph examination conducted by John Consigli of Consigli Polygraph Services.

62.     The polygraph examination determined - based on a 95% confidence interval - that John was telling the truth that he did not have sexual intercourse with Sally on the night in question.

63.     On August 1, 2018, John provided the Investigator with the polygraph examination results.

64.     On August 17, 2018 during John's follow up interview, the Investigator recommended that John and his counsel follow up with Dartmouth's General Counsel about whether the Investigator could consider the polygraph results and, if so, how much weight the results should be given.

65.     On August 20, 2018, John's counsel sent an email to Dartmouth's General Counsel, Sandhya Iyer, requesting that Dartmouth's investigation include consideration of the polygraph results.

66.     On September 4, 2018, Dartmouth Associate General Counsel Dana Scaduto sent a letter to John's counsel stating that "Dartmouth does not allow polygraph examinations to be considered in any student proceedings, including those conducted under the College's Title IX process."

67.     As a result, the Investigator did not consider the polygraph examination results.

68.     Dartmouth has no written policy regarding the use of polygraphs.

69.     Dartmouth did not inform John about is unwritten policy prohibiting polygraphs until after his interview.

### John's Response to the Investigation Report

70.     On September 21, 2018, the Investigator's preliminary investigation report and all the evidence she considered in preparing the report was made available to John for review, including transcripts of the interview of John and Sally and all the witnesses.  On October 8, 2018, John sent the Investigator his comments on the preliminary report.

### The Forensic Testing Results

71.     Sally provided her underwear and sheets to the Hanover Police in connection with their investigation.

72.     During her interview on July 18, 2018, Sally told the Investigator that her "underwear and clothes never got washed," that "the police came and got them," and that they "are at the lab right now."

73.     In his October 8, 2018 response to the preliminary investigation report, John requested that Dartmouth pause its investigation until the Hanover Police had received the results of the forensic testing.  Dartmouth initially approved John's request and paused the investigation on October 12, 2018, stating, in an email: "We are currently working to see how soon this information will be available. It may not be until mid-December."

74.     On October 18, 2018, Kristi Clemens emailed Hanover PD Chief Charlie Dennis to request information regarding the forensic testing of Sally's clothing, including whether the results would be released to Dartmouth.

75.     On October 19, 2018, Chief Dennis responded that Hanover PD's position was that it "will not be releasing any evidence in this case."

76.     On October 23, 2018, Associate General Counsel Dana Scaduto met with Chief Dennis to discuss the forensic testing.  Chief Dennis gave Ms. Scaduto the opportunity to follow up in writing so that Chief Dennis could discuss Dartmouth's position with County Attorney Lara Saffo.

77.     On October 24, 2018, Ms. Scaduto sent an email to Chief Dennis outlining Dartmouth's position regarding the release of the testing results, which included her statement:

> Under Title IX, Dartmouth is required to ensure an "adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence" within a reasonably prompt time frame.  There can be little doubt that in a situation where one party claims there was penile-vaginal intercourse and the other claims that there wasn't, evidence that may be recovered from physical evidence is highly likely to be relevant and could have a material impact on the outcome of the case.  It certainly has the potential as both exculpatory and inculpatory evidence.  To end our investigation without having

14

had the opportunity to consider this information strains our ability to characterize our investigation as impartial. . . . Moreover, Dartmouth would be willing to be guided by the wishes of a complainant in whether information should be released by HPD or the County Attorney to the College.  Should a complainant decline, we will factor that decision into our investigative process but we will abide by the complainant's wishes if doing so would encourage a collaborative approach to evidence sharing.

78.    On November 12, 2018, Judicial Affairs Director Strong notified John that the

Office of Judicial Affairs "[had] been notified that the Hanover Police Department will not share

any results from forensic lab testing with the College, regardless of when they become

available," and that Dartmouth's investigation would resume.

79.    On November 16, 2018, John emailed Director Strong, requesting additional

information about the communications with the Hanover Police.

80.    On November 20, Director Strong responded, stating:

Over the last few weeks, we spent a good deal of time communicating with both HPD and the County Attorney about the importance of the availability of all potentially material and relevant information to Dartmouth's Title IX process. After considering our position, we were informed that the initial position of HPD that the test results would not be released to Dartmouth at any time was final. Our process is moving forward to completion utilizing all information available to us at this time. Should the test results we have been seeking from HPD or the County Attorney become available at some point in the future, we invite you to bring it to our attention.

**John's Request for Additional Testimony**

81.    On October 8, 2018, John submitted a 10-page response to the Preliminary Report

in which he raised concerns about certain inconsistencies in Sally's story, factual inaccuracies in

the Preliminary Report, and relevant evidence not considered by the Investigator.  John's

response identified the following inconsistencies in Sally's story:

A.  Sally's inconsistent statements on whether she and John had had intercourse

in the Fall of 2017;

15

B.  Sally's false statement to the Hanover PD that John texted her the morning after the incident and caused her distress, when in fact she was the one who texted first;

C.  The inconsistency between Sally claiming she was trying to draw a clear line that she and John would not be engaging sexually that night and her statement that she undressed in front of him;

D.  Sally's statements that she avoided John's teammates which was contradicted by the evidence that she sought out nearly half of John's teammates who were on campus that summer to share her account of what happened between her and John;

E.  Sally's false statements about being approached in the dining hall by the girlfriend of one of John's teammates;

F.  The inconsistencies between the photographs of the bruise on Sally's leg that she submitted to the Investigator and the story she told about how she got that bruise;

G.  The inconsistencies between Sally's various accounts of her involvement in the incident (e.g., "just laying there" vs. engaging in a "struggle" against John);

H.  The three contradictory stories Sally gave about what she did with the clothes she was wearing that night between the time she took them off to shower and when she provided them to the police (i.e., telling the Hanover PD officer that her clothes were in the back of her drawer, telling the Investigator that she put her clothes in a plastic bag immediately after showering on May 29, and the

16

text messages from May 22 confirming that she had not done anything with her clothes before that point);

I.   The inconsistency between Sally stating that she tried to avoid John's teammates and his fraternity and that fact that in July, when she knew John was living at the fraternity house, she asked if she could attend a party at the fraternity house; and

J.   The inconsistency between Sally stating that John was partying on campus and at his fraternity during the Summer and Fall terms, when John provided evidence that he went home to be with his family every available weekend during the investigation.

82.   John also identified a new proposed witness for the Investigator to interview and suggested further questioning of one existing witness and of Sally.  These suggested lines of inquiry could have potentially shed light on possible motivations for Sally to embellish or provide a false account of what occurred on May 20, and to impeach Sally's credibility on certain facts.

83.   The Investigator did not conduct any interviews of the individuals identified by John in his October 8 response, conduct any follow-up investigation on the inconsistencies John identified, ask any of the questions John requested, or ask any obvious questions like, "why did you omit the 2:17 p.m. text message from your submission," or "why did you omit the text messages where you told John 'mi casa es su casa' or that you have a 'comfy bed'"

84.   In this Report, the Investigator stated, "Because [John] provided a complete set of text messages early on in the investigation, [Sally] was not asked to supply a duplicative set."

**The Final Investigation Report**

85.     On November 29, 2018, Dartmouth provided to John for review the final investigation report and evidence the Investigator considered in preparing the report.

86.     The investigator concluded that, "a preponderance of the evidence supports a finding that John engaged in penetrative sexual intercourse without Sally's consent." As a result, I conclude that John committed sexual assault against Sally in violation of Standard III of the Unified Procedures." Investigation Report at p. 19.

87.     The Final Report did not indicate that the Investigator credited John's evidence or witnesses, conducted any of the additional investigation John requested, asked any of the questions submitted by John of Sally or other witnesses, or discredited Sally's text messages or other statements based on her objectively demonstrable omissions and misrepresentations in her text message submission.

88.     Furthermore, in her Final Report the Investigator credits the account of a friend of Sally's - who is the girlfriend of one of John's friends - in part because of the Investigator's incorrect finding that the girl is John's friend.  Additionally, appended to the Final Report are text messages between Sally and this friend where the friend says of hockey players: "They're all trash . . . I hate them all."  This girl's friendship with Sally and her obvious bias against hockey players casts doubt on her credibility, but this was ignored by the Investigator.

### The Sanction Process

89.     Pursuant to the Unified Disciplinary Procedures, the proceeding next went to a sanctioning panel ("Sanctioning Panel") for determination of John's sanction based on the Investigator's findings. The Sanctioning Panel consisted of: Adam Knowlton-Young, Assistant Director of Judicial Affairs; Dean Katherine Burke, Student Affairs; and Professor Nathaniel Dominy, Anthropology.

90.     John submitted a sanctioning statement.

91.     Sally submitted a sanctioning statement, which John was permitted to review. Her sanctioning statement that incorrectly quoted from the text messages.  The misstatements are summarized at ¶¶ 124-127 of the Verified Complaint.

92.     On December 10, 2018, John submitted a supplemental sanctioning statement.

93.     On December 12, 2018, Dartmouth informed John that the Sanctioning Panel determined that the sanction for the finding that John was responsible for violating Standard III was to be expulsion from Dartmouth.

94.     Dartmouth denied John's request to remain on campus while he appealed the Investigator's findings and sanction.

**The Appeal**

95.     On December 19, 2018, John submitted his appeal.  In his appeal, John argued that the Investigator made the following procedural errors: (a) refusal to consider the results of the polygraph exam; (b) failure to consider inconsistencies in Sally's account; (c) failure to consider evidence of Sally "withholding and fabricating evidence;" and (d) failure to conduct appropriate follow-up investigation.  John also argued that the Investigator was biased in favor of Smith.  John also argued that Sally's sanctioning statement misrepresented and misquoted the text messages and should be considered new evidence of Sally's "continued pattern of submitting false evidence."

96.     The appeal has not yet been decided.

**Title IX Regulatory Guidance**

97.     On April 4, 2011, Russlyn Ali, Assistant Secretary for Civil Rights at the U.S. Department of Education, issued a "Dear Colleague" letter to schools and universities setting

19

forth the Department's position on schools' obligations to prevent and address sexual harassment and violence under Title IX.  *See* https://obamawhitehouse.archives.gov/sites/default/ files/dear_colleague_sexual_violence.pdf

98.     On September 22, 2017, the Department issued a letter withdrawing the 2011 Dear Colleague Letter as well as the "Questions and Answers on Title IX and Sexual Violence" issued April 29, 2014.

99.     In place of these documents, the Department issued a new question and answer document – the September 2017 Q&A on Campus Sexual Misconduct – to guide institutions while the Department conducts an official rulemaking process to promulgate new Title IX regulations.

100.    The Department issued proposed regulations for public comment on November 29, 2018.  The public comment period closes January 28, 2019.  The new regulations have not yet been finalized.

**Pressure on Dartmouth**

101.    Before, during, and since the pendency of the case against John, significant attention at Dartmouth had and has been focused on the issues of violence against women and sexual misconduct.  The resulting pressure upon Dartmouth is summarized at ¶¶ 139-189 of the Verified Complaint.

**Consequences of Dartmouth's Decision**

102.    If John's expulsion is allowed to remain, his internship for the Summer of 2019 will be revoked.  As a consequence, John will be deprived of the almost guaranteed future job offer from his internship placement and will certainly be deprived of his right to earn such an offer.

103.    NCAA student-athletes are allowed to compete for four seasons in one sport and, for Division 1, have five calendar years in which to play four seasons of competition.

104.    With limited exceptions, Division 1 student-athletes "who compete for any amount of time during a season use up one season in their sport". See, http://www.ncaa.org/student-athletes/current/transfer-terms.

105.    John has already played in nine games for Dartmouth in the 2018-2019 season. Accordingly, he would not be eligible to play for another Division 1 school's ice hockey team for the 2018-2019 season and would lose an entire year of eligibility if required to transfer. Furthermore, transferring to any other Division I ice hockey program requires sitting out an entire season. This means that the next full season John could possibly suit up is 2020-21, which is after his projected graduation date. John would have to further delay his graduation in order to play college hockey again or find a way to enroll in a graduate program, which would extend the time before he could either play professional hockey or embark on his career in finance.

106.    Division 1 college hockey programs assemble their rosters for incoming classes anywhere from one to four years before a given class of recruits enters the school and the ice hockey program.

107.    Because Division 1 hockey rosters are planned and built through high school and junior hockey recruitment years in advance, transfer opportunities for upperclassmen are limited.

108.    If John is expelled from Dartmouth, he will be deprived of the opportunity to participate in college ice-hockey, perhaps permanently, but certainly on a continuous and uninterrupted basis.

**PROPOSED CONCLUSIONS OF LAW**

1.      When ruling on a motion for preliminary injunction, the court must assess: (1) the movant's likelihood of success on the merits of their substantive claim(s); (2) the potential that the movant will face irreparable harm in the absence of an injunction; (3) the balance of the equities between the parties; and (4) the public interest.  See Cohen v. Brown Univ., 991 F.2d 888, 901 (1st Cir. 1993) (upholding the grant of a preliminary injunction under Title IX against a private university seeking to discontinue its varsity women's volleyball and gymnastics teams).

**Likelihood of Success on the Merits**

2.      John Doe has shown a likelihood of success on the merits of his breach of contract, breach of the covenant of good faith, and Title IX claims.

<u>Breach of Contract</u>

3.      The relationship between Dartmouth and John is contractual in nature.  Marlowe v. Keene St. Coll., 189 F. Supp. 3d 326, 332 (D. Mass. 2016) (applying New Hampshire law).

4.      The terms of the contractual relationship between Dartmouth and John consist of the terms contained in the Student Handbook and other college materials, including the Unified Disciplinary Procedures for Sexual Assault and the Standards of Conduct.  Bleiler v. Coll. of the Holy Cross, Civil Action No. 11-11541-DJC, 2013 WL 4714340, at *14 (D. Mass. Aug. 26, 2013), appeal dismissed, No. 13–2245 (1st Cir. Apr. 30, 2015).

5.      When reviewing the contractual relationship and the relevant documents, courts "employ a reasonable expectations standard," which requires that they "ask what meaning the party making the manifestation, the university, should reasonably expect the other party[, the student,] to give it."  Doe v. Trs. of Boston Coll., 892 F.3d 67, 80 (1st Cir. 2018) (internal citations and quotation marks omitted).

6.      "In the context of disciplinary hearings, [courts] 'review the procedures followed

to ensure that they fall within the range of reasonable expectations of one reading the relevant

rules.'" Id. (quoting Cloud v. Trs. of Boston Univ., 720 F.2d 721, 724-25 (1st Cir. 1983)).

7.      "'[I]f the facts show that the university has failed to meet [the student's]

reasonable expectations' the university has committed a breach."  Id. (quoting Walker v.

President & Fellows of Harv. Coll., 840 F.3d 57, 61 (1st. Cir 2016)).

8.      "[Dartmouth's] obligation to provide basic fairness in its proceedings is separate

from and in addition to its contractual obligation to follow the rules it set forth in the [Unified

Disciplinary Procedures]."  Doe v. Brandeis Univ., 177 F. Supp. 3d at 601, citing Cloud v. Trs.

of Bos. Univ., 720 F.2d at 725.  "Basic fairness" in university disciplinary proceedings includes

both "procedural fairness" - "whether the process used to adjudicate the matter was sufficient to

provide the accused student a fair and reasonable opportunity to defend himself" - and

"substantive fairness" - "whether the decision was unduly arbitrary or irrational, or tainted by

bias or other unfairness."  Id. at 602.

9.      "It is well-established, . . . that a private university is not required to adhere to the

standards of due process guaranteed to criminal defendants or to abide by rules of evidence

adopted by courts. . . .  However, courts may refer to those rules in evaluating the fairness of a

particular disciplinary hearing."  Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 602 (D. Mass.

2016) (citing Cloud, 720 F.2d at 725 (internal citations and quotations omitted)).

10.     John has shown a likelihood of success on his claim that, based on the

"reasonable expectations" standard, Dartmouth breached its contract with him by failing to

conduct its investigation in a fair, thorough, and impartial manner, as required under the Unified

Disciplinary Procedures, because: 1) Dartmouth refused to allow the Investigator to consider the

results of John's polygraph examination; 2) the Investigator failed to conduct a sufficient follow-up investigation of the inconsistencies in Sally Smith's account, as identified by John Doe; and 3) Dartmouth failed to pause its investigation to obtain the results of forensic testing being conducted by the Hanover PD, and the Investigator made a finding with regard to the forensic testing that is inconsistent with Dartmouth's previous position on the matter, as expressed in emails to the Hanover PD.

11.    John has shown a likelihood of success on his claim that Dartmouth breached its contract with him by failing to provide elements of basic fairness, including its failure to provide for an opportunity for John to cross-examine Sally or to confront her in any way, its failure to provide him with adequate notice of the allegations against him, and its failure to provide for an effective appeal right.

Breach of Implied Covenant of Good Faith and Fair Dealing

12.    Every agreement entered into in New Hampshire includes "an implied covenant that the parties [will] act in good faith and fairly with one another." Birch Broad, Inc. v. Capitol Broad Corp., Inc., 161 N.H. 192, 198 (2010).

13.    In the university discipline context, the implied covenant of good faith and fair dealing prohibits the university from administering and enforcing its disciplinary policies in violation of students' "reasonable expectations." See Bleiler v. Coll. of Holy Cross, No. CIV.A. 11-11541-DJC, 2013 WL 4714340, at *17 (D. Mass. Aug. 26, 2013) (holding that student failed to prove that college violated implied covenant of good faith and fair dealing where it "[did] not [meet] the 'reasonable expectations' underlying the terms of the Handbook and related documents.").

14.     John has shown a likelihood of success on his claim that Dartmouth breached the covenant of good faith and fair dealing implied in their contractual relationship by: 1) its refusal to allow the Investigator to consider the results of John's polygraph examination; 2) the Investigator's failure to conduct a sufficient follow-up investigation of the inconsistencies in Sally Smith's account, as identified by John Doe; and 3) Dartmouth's failure to pause its investigation to obtain the results of forensic testing being conducted by the Hanover PD.

Title IX Claim

15.     "Title IX prohibits gender-based discrimination in a wide array of programs and activities undertaken by educational institutions."  Doe v. Amherst Coll., 238 F. Supp. 3d at 221 (citing Frazier v. Fairhaven Sch. Comm., 276 F.3d 52, 65 (1st Cir. 2002)).

16.     "One of the purposes of Title IX is 'to provide individual citizens with effective protection against [discriminatory] practices.'"  Id. (quoting Cannon v. Univ. of Chi., 441 U.S. 677, 704 (1979)).

17.     "Title IX provides that '[n]o person in the United States shall, on the basis of sex . . . be subjected to discrimination under any education program receiving Federal financial assistance.'"  Doe v. Trs. of Boston Coll., 892 F.3d 67, 89-90 (1st Cir. 2018) (quoting 20 U.S.C. § 1681(a)).

18.     The United States Department of Education ("Department") interprets Title IX's provisions to extend to institutions of higher education that accept federal funds.  34 C.F.R. § 106.41.

19.     Title IX "is enforceable through an implied private right of action."  Id. (quotation marks and citations omitted).

20.     There are "two categories of claims arising in these types of cases, both of which fall under the differential treatment line of Title IX cases.  In one category are claims alleging bias in the disciplinary process led to an erroneous outcome.  The other category includes claims asserting selective enforcement."   Doe v. Amherst Coll., 238 F. Supp. 3d at 222 (internal citations and quotation marks omitted).

21.     "To succeed on an erroneous outcome claim, a plaintiff must demonstrate there was (1) a flawed proceeding that (2) led to an erroneous outcome that was adverse to the plaintiff and (3) specific circumstances causally connecting gender bias to the erroneous outcome."  Doe v. Amherst Coll., 238 F. Supp. 3d at 222 (internal citations and quotation marks omitted).

22.     In stating an erroneous outcome claim under Title IX, John Doe "may rely on circumstantial evidence alone to prove that there was a discriminatory pattern of decision-making" to show that gender bias was a "motivating factor" behind the report finding him responsible.  Doe v. Trs. of Boston Coll., 892 F.3d 67, 92 (1st Cir. 2018).

23.     "In order to prevail on a Title IX selective enforcement claim, Doe must establish his gender was a motivating factor behind either the College's decision to pursue disciplinary action against him or its decision as to the severity of the punishment to impose upon him."   Doe v. Amherst College, 238 F. Supp. 3d at 223.

24.     "Unlike the erroneous outcome claim, a plaintiff can prevail on a selective enforcement claim without disturbing the factual findings made in a disciplinary proceeding."  Id. at 222 (internal citations and quotation marks omitted).

25.     John has shown a likelihood of success on his claim that Dartmouth's investigation violated Title IX, resulting in an erroneous outcome.

26.     John has shown a likelihood of proving at trial that Dartmouth's investigation was flawed in several ways, including: Dartmouth's ignoring and excusing material omissions and misstatements from Sally Smith that both tended to prove John's innocence and should have discredited Sally; Dartmouth's refusal to consider credible polygraph evidence exonerating John, in violation of its contractual promise to "solicit[ ] and review[ ] documentation relevant to the investigation," notwithstanding having no written policy against considering such relevant evidence of which John or any other student would have notice; Dartmouth's recognizing the importance of forensic evidence collected by the Hanover PD, such that it temporarily suspended its investigation to allow it to consider the highly relevant physical evidence, but failing to obtain that critical evidence and forging ahead to an erroneous decision without the benefit of that evidence; the Investigator making a conclusion in her Final Report about the evidentiary value of the forensic testing results that conflicts with Dartmouth's earlier position that the results could be dispositive and that ending its investigation "without having had the opportunity to consider this information strains [Dartmouth's] ability to characterize [its] investigation as impartial"; John's receiving insufficient notice of the charge against him; and Dartmouth's failure to provide an adequate avenue of appeal.

27.     John has shown a likelihood of proving at trial that Dartmouth's flawed investigation led to an erroneous outcome that adverse to him, to wit, his expulsion from Dartmouth.

28.     John has shown a likelihood of proving at trial that specific circumstances exist causally connecting gender bias to the erroneous outcome, including: Dartmouth's application of the Unified Disciplinary Procedures in a discriminatory manner; significant pressure from within the Dartmouth community for Dartmouth to adopt an anti-male bias in Title IX investigations,

including threats from alumni to withhold donations; and significant pressure from outside

Dartmouth for the adoption of an anti-male bias in Title IX investigations, including pressure

from the U.S. Department of Education and the fact that Dartmouth was under federal

investigation for its handling of Title IX complaints.

29.     John has shown a likelihood of success on his claim that Dartmouth selectively

enforced its policies against him and that such selective enforcement was motivated by his

gender, as evidenced by Dartmouth's full-throated enforcement of the Unified Disciplinary

Policy against him while at the same time refusing to enforce its policies against Sally Smith for

providing incomplete and altered evidence to the Investigator and the Sanctioning Panel.

**Irreparable Harm**

30.     Allegations that a suspension or expulsion from college would damage a student's

academic and professional reputation is sufficient to establish irreparable harm at the preliminary

injunction stage.  Doe v. Univ. of Cincinnati, 223 F. Supp. 3d at 712.

31.     "While [a] Plaintiff may recover money damages to compensate for lost wages,

money damages cannot compensate for the loss of his senior year in college with his class, the

delay in the completion of his degree, or the opportunity to begin his career . . . .  Further,

Plaintiff would have to explain, for the remainder of his professional life, why his education

either ceased prior to completion or contains a gap."  Doe v. Middlebury Coll., No. 1:15-CV-

192-JGM, 2015 WL 5488109, at *3 (D. Vt. Sept. 16, 2015).

32.     John would suffer irreparable harm because he "would be asked to explain [a gap

in their education] by future employers or graduate school admissions committees, which would

require him to reveal that he was found guilty of sexual misconduct by DePauw." King v.

DePauw University, No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014).

33.     Irreparable harm that flows from being expelled from a university is not adequately mitigated by transferring to another school, because "students who transfer must leave behind the professors, friends, and campuses they are familiar with to start all over again." Portz v. St. Cloud Univ., 196 F. Supp. at 972.  "While transferring in some instances may be the best decision for a particular student, the fact that very few students transfer and the vast majority do not proves the obvious fact that transferring is costly."  Id.

34.     "'[G]iven the fleeting nature of college athletics,' a plaintiff suffers an irreparable harm if he or she 'los[es] the opportunity to participate in their sport of choice on a continuous and uninterrupted basis.'"  Portz v. St. Cloud St. Univ., 196 F. Supp. 3d 963, 972 (D. Minn. 2016) (quoting Biediger v. Quinnipiac Univ., 616 F. Supp. 2d 277, 291 (D. Conn. 2009) (citing McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck, 370 F.3d 275, 302 n. 25 (2d Cir.2004) (collecting cases and finding that the deprivation of the opportunity to play a sport constitutes an irreparable harm).  See also Cohen v. Brown Univ., 991 F.2d at 904 (upholding the district court's finding "that, absent judicial intervention, the plaintiffs would suffer irremediable injury in at least three respects: competitive posture, recruitment, and loss of coaching" if the women's gymnastics and volleyball teams were demoted from varsity sports to club sports).

35.     Irreparable harm through loss of a collegiate athletic opportunity is not mitigated by the plaintiff's ability to "transfer and play somewhere else" because it would be "too costly to mitigate the irreparable nature of losing an intercollegiate sporting opportunity," since "[s]tudent-athletes who transfer must 'break into new programs with new coaches and established rosters,' increasing the possibility that their athletic development will be 'stunt[ed]'

just as they are on the precipice of the 'highest level of amateur competition.'" Portz v. St.
Cloud Univ., 196 F. Supp. 3d at 972 (quoting Biediger, 616 F.Supp.2d at 292).

      36.    In the absence of an injunction, John Doe would be irreparably harmed in several
ways, including: the delay in completion of his degree; the gap in his education that he will have
to explain; the loss of his internship and resulting loss of a permanent placement after
graduation; loss of athletic eligibility for a year; loss of the opportunity to participate in college
ice hockey, perhaps permanently, but certainly on a continuous and uninterrupted basis; the loss
of coaching, free tutoring and academic advising, athletic, strength and nutritional training,
leadership training, career advising and placement, the opportunity to travel around the country,
the joy of competition, the camaraderie of teammates, and the ability to play for and contribute to
his team.

### Balance of Equities

      37.    The balance of the equities weighs in favor of a preliminary injunction because
while John will suffer immediate and lasting irreparable harm without one, Dartmouth will suffer
only limited harm if it ultimately prevails and the injunction is lifted.  Any harm to Sally Smith
can be minimized by the maintenance of the no-contact order between her and John.

### Public Interest

      38.    When a plaintiff has a likelihood of success on a Title IX claim, "the public
interest weighs in [p]laintiff's favor because the public's interest in eradicating sex
discrimination is compelling." Portz v. St. Cloud Univ., 196 F. Supp. 3d at 978 (citing Bob
Jones Univ. v. United States, 461 U.S. 574, 604 (1983)).

      39.    The broad public interest in enforcing fundamental constitutional principles" and
contractual fairness claims against universities in the Title IX context is sufficient to justify

issuing a preliminary injunction against allegedly unfair disciplinary proceedings.  See e.g., Doe

v. Univ. of Cincinnati, 223 F. Supp. 3d at 712.

      40.    The public interest in this case weighs in favor of granting an injunction.

                                     Respectfully submitted,

Date: January 22, 2019                    /s/ William E. Christie
WILLIAM E. CHRISTIE
NH Bar # 11255
S. AMY SPENCER
NH Bar # 266617
ALEXANDER W. CAMPBELL
NH Bar # 268958
SHAHEEN & GORDON, P.A.
107 Storrs Street
Concord NH 03302
(603) 225-7262
wchristie@shaheengordon.com
saspencer@shaheengordon.com
acampbell@shaheengordon.com

*Attorneys for plaintiff John Doe*

## CERTIFICATE OF SERVICE

     I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

DATED:  January 22, 2019             /s/ William E. Christie
William E. Christie
NH Bar No. 11255